IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DELVILLE BENNETT,

                                    Plaintiff,

        v.                                  Civil Action No.
                                            9:09-CV-1236 (FJS/DEP)

BRIAN FISCHER, DALE ARTUS, and
H. MARTIN,

                                    Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

DELVILLE BENNETT, *pro se*
98-A-1110
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          ADAM W. SILVERMAN, ESQ.
Attorney General for the State of  Assistant Attorney General
New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Delville Bennett, a New York State prison inmate, has commenced this civil rights action pursuant to 42 U.S.C. §1983 against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and two other DOCCS employees, alleging violations of his constitutional rights. While in his complaint plaintiff initially alleged that his rights under the First, Eighth, and Fourteenth Amendments were infringed by the defendants, as a result of subsequent motion practice all that remains of plaintiff's claims is a procedural due process cause of action under the Fourteenth Amendment.

Currently pending before the court is defendants' motion for judgment on the pleadings seeking dismissal of plaintiff's remaining procedural due process cause of action. For the reasons set forth below, I recommend that defendants' motion be granted, without leave to replead.

I.    <u>BACKGROUND</u>[1]

---

[1]    In light of the procedural posture of the case the following recitation is derived from plaintiff's complaint, the allegations of which have been accepted as true for purposes of the present motion. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.),

2

Plaintiff is a New York State prison inmate entrusted to the care and custody of the DOCCS.  *See generally* Complaint (Dkt. No. 1).  At the times relevant to the claims set forth in his complaint, Bennett was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.*

Plaintiff's claims grow out of his September 21, 2008 attendance at a Pentecostal Christian service held at Clinton, during which he served as a member of the choir and participated in dancing and singing associated with the event.[2]  *Id*. at ¶¶ 6-7.  Plaintiff alleges that during the service he "was dancing and singing approximately 6 to 7 feet from the alter in the chapel as an act of worship[,]" and that as he exited the chapel area following the service he was confronted by defendant H. Martin, a corrections officer, and asked to produce his identification card, which the

_____

*cert. denied*, 513 U.S. 816, 115 S. Ct. 73 (1994); *DeJean v. County of Nassau,* No. CV-06-6317, 2008 WL 111187, at *1 n.2 (E.D.N.Y. Jan. 8, 2008).

[2]      Plaintiff's complaint is equivocal as to whether the relevant events giving rise to his claims occurred in September of 2008, or instead one year later.  *See, e.g.* Complaint (Dkt. No. 1) ¶ 6 (alleging that the relevant events were set in motion on September 21, 2009) and ¶ 11 (alleging that the resulting disciplinary hearing was held on September 25, 2008).  Plaintiff's prison records reflect that he was incarcerated at Clinton, where the relevant events took place, from January of 2008 through April of 2009.  *See* Brousseau Aff. (Dkt. No. 14-2) ¶ 12.  Accordingly, it appears likely that the incidents upon which plaintiff's claims are based occurred in September of 2008.

officer then confiscated.  Complaint (Dkt. No. 1) ¶¶ 7-9.  Plaintiff was later issued a misbehavior report accusing him of creating a disturbance, participating in an unauthorized demonstration, and refusing to obey a direct order.  *Id.* at ¶ 10.

A disciplinary hearing was conducted on September 25, 2008 to address the charges set forth in the misbehavior report.  Complaint (Dkt. No. 1) ¶ 11.  At the conclusion of that hearing plaintiff was found guilty of creating a disturbance and refusing to obey a direct order, but was acquitted of the demonstration charge.  *Id*.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on November 4, 2009.  Complaint (Dkt. No. 1).  Plaintiff's complaint names DOCCS Commissioner Brian Fischer; Dale Artus, the Superintendent at Clinton; and Corrections Officer H. Martin, as defendants and asserts claims for violation of his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See generally id*.

Prior to answering plaintiff's complaint but following some initial procedural activity, the defendants moved on February 25, 2010 for summary judgment dismissing plaintiff's claims.  Dkt. No. 14.  The focus

4

of that motion was upon plaintiff's alleged failure to exhaust available administrative remedies before filing suit, as well as on the alleged lack of personal involvement on the part of defendants Fischer and Artus in the constitutional violations claimed in plaintiff's complaint.[3]  As a result of that motion, on August 17, 2010 I issued a report recommending dismissal of plaintiff's First and Eighth Amendment claims but denial of the remaining portions of defendants' motion.  Dkt. No. 23.  In that report, I acknowledged plaintiff's apparent effort to plead a procedural due process violation and stated that I was unable to recommend dismissal of that claim on either of the two grounds asserted in defendants' motion.  *Id.* That report and recommendation was adopted by Senior District Judge Frederick J. Scullin on January 4, 2011.  Dkt. No. 35.

On June 24, 2011, the defendants moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings seeking dismissal of plaintiff's remaining due process claim.  Dkt. No. 41. In their pending motion, defendants urge the court to take notice of the fact that plaintiff's disciplinary hearing resulted in the imposition of a penalty of only sixty days of disciplinary special housing unit ("SHU")

---

[3]      The legal sufficiency of plaintiff's due process claim itself was not questioned in defendants' first motion.

confinement - a penalty which, they maintain, was suspended and

ultimately never served - and argue based upon this fact that plaintiff

cannot establish the deprivation of a liberty interest sufficient to trigger the

procedural due process protections of the Fourteenth Amendment.  *Id*.

The plaintiff has since responded in opposition to defendants' motion, Dkt.

No. 45, which is now ripe for determination and has been referred to me

for the issuance of a report and recommendation, pursuant to 28 U.S.C. §

636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See*

Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Judgment on the Pleadings Motion Standard

Defendants' motion is brought pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, which governs the entry of judgment on the

pleadings.[4]  When analyzing a Rule 12(c) motion, I must apply the same

standard as that applicable to a motion under Rule 12(b)(6).  *See, e.g.*,

*Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S.

816, 115 S. Ct. 73 (1994); *Wynn v. Uhler*, 941 F. Supp. 28, 29 (N.D.N.Y.

---

    [4]    That rule provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c).

1996).  As is the case with respect to a Rule 12(b)(6) motion, the focus of

a motion for judgment on the pleadings is upon the four corners of

plaintiff's complaint, as well as any attached exhibits or documents

incorporated within it by reference.[5]   *See Cleveland v. Caplaw*

*Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Nechis v. Oxford*

*Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005)).

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure, calls upon a court to gauge the

facial sufficiency of that pleading, utilizing as a backdrop a pleading

standard which, though unexacting in its requirements, "demands more

than an unadorned, the-defendant-unlawfully-harmed me accusation" in

order to withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.

---

[5]    In their motion defendants urge the court to consider certain pertinent documents regarding the disciplinary proceedings against the plaintiff, including the hearing officer's determination revealing the penalty imposed.  *See Silverman Decl.* (Dkt. No. 41-1) ¶¶ 4-7.  Those documents, however, are neither appended to plaintiff's complaint nor specifically incorporated within it by reference, and are therefore not properly considered on a Rule 12(c) motion.  *See Cleveland*, 448 F.3d at 521.  Should the court desire to consider such extrinsic matters in ruling upon the sufficiency of plaintiff's claims, the proper recourse would be to convert the motion to one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in which case the plaintiff would be entitled to notice of the conversion and an opportunity to submit further materials in opposition to the motion.  Fed.R.Civ.P. 12(d)*; Stephens v. Kemp*, 469 U.S. 1043, 105 S. Ct. 530 (1984); *Hernandez v. Coffey*, 582 F.3d 303 (2d Cir. 2009).  Because plaintiff's complaint is subject to dismissal on its face, however, I have chosen not to recommend a conversion of defendants' motion.

Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences

8

in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) nonetheless remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'"  *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

     B.     <u>Sufficiency of Plaintiff's Remaining Due Process Claim</u>

In his sole remaining claim, plaintiff alleges that he was deprived of a constitutionally cognizable liberty interest without having been afforded procedural due process. To successfully state such a claim, the plaintiff must show that he both 1) possessed an actual liberty interest,

and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1.    Liberty Interest Deprivation

In *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), the United States Supreme Court determined that to establish a protected liberty interest, a plaintiff must sufficiently demonstrate that 1) the State actually created a protected liberty interest in being free from segregation; and that 2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S. Ct. at 2300; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658.  Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe*, No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6

(N.D.N.Y. Feb. 6, 2001) (Kahn, J.),[6] the central inquiry for purposes of this element is upon whether the conditions of the plaintiff's SHU disciplinary confinement as alleged rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[7]   *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).   In determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey,* 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997).  In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[8]   *Hynes*,

_____

[6]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[7]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution.  *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey,* 197 F.3d at 585.

[8]     While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin.  Colon*, 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, *see id.* at 232 n.5, the

143 F.3d at 658; *Arce*, 139 F.3d at 336.

Plaintiff's complaint fails to allege facts to support a plausible claim that he was deprived of a liberty interest sufficient to trigger the protections of the Fourteenth Amendment.  Indeed, the complaint does not even allege in conclusory fashion that he was deprived of a constitutionally-significant liberty interest, stating only that he was found guilty following a disciplinary hearing but making no mention of the penalty imposed.[9]  *See* Complaint (Dkt. No. 1) ¶ 11.  Plaintiff's due process claim is therefore subject to dismissal for failure to plausibly demonstrate the deprivation of a liberty interest sufficient to trigger the protections of the Fourteenth Amendment.

2.    Due Process Requirements

_____

Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.  *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).  In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

[9]    If, as defendants allege, plaintiff was sentenced to a period of sixty days of disciplinary SHU confinement and the penalty imposed was suspended and never served, then he ultimately will be unable to establish the deprivation of a cognizable liberty interest.  *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) ("No right to due process is implicated in the prison context unless a liberty interest has been deprived, and we read *Sandin* to require that we look to actual punishment in making this determination.").

12

The second prong of the due process inquiry focuses upon the safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest.  Those safeguards are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, the hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768 (1985).

Plaintiff's complaint is similarly devoid of any allegations of fact that would plausibly demonstrate the denial of the right to these safeguards in

13

conjunction with any liberty interest deprivation that may have occurred.

Instead, plaintiff's complaint merely alleges in wholly conclusory fashion

that he was denied due process.  Such a bald assertion, unsupported by

factual allegations, is precisely the type of conclusory "I have been

wronged" pleading that *Iqbal* and *Twombly* make clear cannot withstand

Rule 12(b)(6) scrutiny.  Accordingly, plaintiff's procedural due process

claim is subject to dismissal on this basis as well.

　　　C.　　Whether to Grant Leave to Amend

　　　The remaining issue to be addressed is the question of whether

plaintiff should be granted leave to amend and thereby afforded the

opportunity to cure the deficiencies discerned in connection with his

procedural due process claim.  Generally, in the event of a perceived

deficiency in a *pro se* plaintiff's complaint a court should not dismiss

without granting leave to amend at least once if there is any indication that

a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d

Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely

given when justice so requires").  However, an opportunity to amend is not

required where "the problem with [plaintiff's] causes of action is

substantive" such that "[b]etter pleading will not cure it."  *Cuoco v.*

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.")  (affirming, in part, dismissal of claim with prejudice) (citation omitted); *cf.  See Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999) (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.").

With their motion the defendants have included certain documents associated with plaintiff's disciplinary hearing on September 25, 2008 which formed the basis for his procedural due process claim.  Those documents draw into serious question plaintiff's ability to establish the deprivation of a liberty interest sufficient to entitle him to the procedural safeguards guaranteed under the Fourteenth Amendment.  Even the imposed penalty of sixty days of disciplinary SHU confinement – a penalty which apparently was never served – would be insufficient under ordinary circumstances to satisfy the liberty deprivation element of a cognizable

due process claim.  *Pilgrim v. Bruce*, No. 9:05-cv-198, 2008 WL 2003792,

at * 14-15 (N.D.N.Y. May 7, 2008) (Peebles, M.J.);  *Silva v. Sanford*, No.

91CIV.1776, 1998 WL 205326, at *16-17 n.16(S.D.N.Y. Apr. 24, 1998)

(citing cases).  In the event plaintiff has evidence that he suffered other

direct consequences as a result of the September 25, 2008 disciplinary

hearing that are not readily apparent from either his complaint or

defendants' motion papers and could suffice to satisfy the liberty interest

deprivation provision of the Fourteenth Amendment, he is encouraged to

raise them in objections to this report and recommendation.  Based upon

the record now before the court, however, I conclude that the

shortcomings discerned in this report and recommendation are

substantive in nature, and that to permit plaintiff leave to amend would be

an exercise in futility.  I therefore recommend against granting plaintiff

leave to amend.[10]

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The sole remaining claim in this action alleges a deprivation of

procedural due process growing out of a disciplinary hearing conducted to

---

[10]     Plaintiff's opposition to the pending motion is focused upon his First
Amendment religious deprivation claim. His causes of action associated with that
religious deprivation, however, have been dismissed and are now no longer a part of
this case.

address the misbehavior report administered to the plaintiff.  Plaintiff's complaint, however, fails to assert facts to demonstrate the existence of a plausible procedural due process claim, lacking factual detail as to both the liberty interest of which he was allegedly deprived and the procedural safeguards which he did not receive in connection with that deprivation. Accordingly, I recommend that defendants' motion be granted, and that plaintiff's remaining claim be dismissed.  I further recommend, based upon the record now before the court, that the plaintiff not be granted leave to amend, in light of my finding based upon the record now before the court that any amendment would likely be futile.  Accordingly, It is hereby respectfully

RECOMMENDED, that defendants' motion for judgment on the pleadings (Dkt. No. 41) be GRANTED, and that the remaining portions of the plaintiff's complaint be DISMISSED, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     January 9, 2012
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

18



Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Patrick DeJEAN, Plaintiff,
v.
COUNTY OF NASSAU, Kathleen Rice, District
Attorney, individually and in her official capacity,
Steven L. Schwartz, Assistant District Attorney,
individually and in his official capacity, Gregory Hecht,
Associate Court Clerk of the District Court of Nassau
County, individually and in his official capacity,
Defendants.
No. CV–06–6317 (SJF)(AKT).

Jan. 8, 2008.
Patrick DeJean, Ossining, NY, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** On November 20, 2006, *pro se* plaintiff Patrick
DeJean (plaintiff) commenced this action against the
County of Nassau (the County), Kathleen Rice (Rice), the
Nassau County District Attorney, Steven L. Schwartz
(Schwartz), Assistant District Attorney (collectively, the
County defendants), and Gregory Hecht (Hecht),
Associate Court Clerk of the District Court of Nassau
County FN1, all in their individual and official capacities,
alleging violations of 18 U.S.C. § 1983. The County
defendants now move pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure for judgment on the
pleadings. Plaintiff has not opposed the motion. For the
reasons stated herein, the County defendants' motion is
granted.

> FN1. By order dated October 25, 2007, I granted
> Hecht's motion for judgment on the pleadings
> and dismissed the complaint as against him.

I. Background

A. Factual Background FN2

> FN2. As is required on a motion pursuant to Rule
> 12(c) of the Federal Rules of Civil Procedure,
> the factual allegations in the complaint, though
> disputed by defendants, are accepted to be true
> for purposes of this motion, and all reasonable
> inferences are drawn therefrom in favor of
> plaintiff. They do not constitute findings of fact
> by this court.

Plaintiff alleges that on September 25, 2005, he was
arrested by Detective Fredrick Penna (Penna) of the
Nassau County Police Department (NCPD), "and charged
with leaving the scene of a fatal accident which allegations
and charges wer [sic] untrue." (Complaint [Compl.], ¶ 5).

Plaintiff alleges that on August 24, 2006 FN3, he
attempted to file criminal charges against Penna for
perjury, official misconduct, tampering with public
records, and offering a false instrument for filing with the
Nassau County District Court (the District Court) relating
to Penna's filing of criminal complaints against plaintiff
allegedly containing false statements. (Compl., ¶ 6).
According to plaintiff, he mailed four (4) misdemeanor
complaints to the District Court for filing. (*Id.*).

> FN3. Although the complaint sets forth the date
> as August 24, *2005,* that date is clearly incorrect.

Plaintiff alleges that on October 4, 2006, Hecht
returned his misdemeanor complaints and informed him
that the District Attorney's Office, and, specifically,
defendant Schwartz, had informed him that they had
declined to prosecute plaintiff's misdemeanor complaints
pursuant to N.Y. C.P.L. § 160.50(3)(i). (Compl., ¶ 7).

B. Procedural History

On November 20, 2006, plaintiff commenced this
civil rights action against the County defendants and
Hecht FN4 pursuant to 42 U.S.C. § 1983, alleging, *inter
alia,* that the County defendants violated his First and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

Fourteenth Amendment rights to access the courts and equal protection of the law (1) by interfering with his right to file misdemeanor complaints and commence a criminal proceeding (second cause of action); (2) by having a "policy, custom and practice which shield police officers, who commit perjury and other criminal acts during arrest and filing of criminal complaints, from criminal liability against criminal complaints filed by plaintiff * * *," (third and fifth causes of action); and (3) by screening plaintiff's misdemeanor complaints and "circumvent[ing] them from being filed with the District Court pursuant to defendants' [aforementioned] policy, custom and practice," (fourth cause of action).

> FN4. At all relevant times, Hecht was an Associate Court Clerk, and, thus, was an employee of the State of New York.

The County defendants now move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

II. Discussion

A. Standard of Review

*2 In deciding a Rule 12(c) motion, the same standard as that applicable to a motion under Rule 12(b)(6) is applied. See Desiano v. Warner–Lambert & Co., 467 F.3d 85, 89 (2d Cir.2006). A motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted only when a plaintiff pleads sufficient facts "to state a claim for relief that is plausible on its face." In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). A "formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic, 127 S.Ct. at 1959. Accordingly, the applicable standard on a motion to dismiss pursuant to Rule 12(b)(6) requires, at least, allegations "plausibly suggesting (not merely consistent

with)," liability. Williams v. Berkshire Financial Group, Inc., 491 F.Supp.2d 320, 324 (E.D.N.Y.2007).

In determining a motion pursuant to Rule 12(c), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See, Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir.2003); see also Roth v. Jennings, 489 F.3d 499, 510 (2d Cir.2007). Moreover, a court must "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 [2d Cir.1994] ). Nonetheless, a pro se plaintiff is not exempt from compliance with relevant rules of procedural and substantive law. Traguth v. Zuck, 710 F.2d 90, 92 (2d Cir.1983).

B. 42 U.S.C. § 1983 Claims [FN5]

> FN5. 42 U.S.C. § 1983 provides, in pertinent part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress* * *."

1. Municipal Liability (Monell Claims)

The County defendants contend that plaintiff cannot establish municipal liability against the County based on his assertion that the District Attorney's Office has a custom, policy and/or practice which precludes consideration of criminal charges brought by an accused against police officers, and insulates from investigation and criminal liability police officers who allegedly commit perjury and other criminal acts when a pretrial detainee brings charges against them.

A municipality or municipal entity cannot be held

Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

liable under § 1983 on a *respondeat superior* theory. *See, Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Linder v. City of New York,* 263 F.Supp.2d 585, 591 (E.D.N.Y.2003).* A municipal entity may only be held liable if the alleged offending conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipal] officers[,] * * * [or] governmental 'custom' even though such a custom has not received formal approval through the [municipality's] official decisionmaking [sic] channels." *Monell,* 436 U.S. at 690, 98 S.Ct. 2018. The plaintiff must show a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

**\*3** To establish the existence of a municipal policy or custom, the plaintiff must allege (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees. *Moray v. City of Yonkers,* 924 F.Supp.8, 12 (S.D.N.Y.1996); *see also Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 478 (E.D.N.Y.2002). *Monell* claims are not subject to a heightened pleading standard and need only comply with the notice pleading requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure, i.e. that it include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

Plaintiff does not allege the existence of a formal policy officially endorsed by the County or that the County took any direct action with respect to the conduct alleged in the complaint. Thus, municipal liability, if any, must be based on the specific actions of an official with final policymaking authority. *See Barrett v. Orange County Human Rights Commission,* 194 F.3d 341, 350 (2d Cir.1999).* In this respect, the County can only be held liable for the actions of its own policymakers. *See Myers v. County of Orange,* 157 F.3d 66, 76 (2d Cir.1998).

a. Liability based upon Rice's Conduct

To the extent plaintiff's *Monell* claims are based on allegations that Rice, as an official with final decision-making authority, was implicated in the decision not to bring charges against Penna, those claims are insufficient to establish municipal liability against the County. Under New York law, district attorneys and assistant district attorneys are generally presumed to be local county officers, not state officers. *See* N.Y. Pub. Off. Law § 2; N.Y. County Law § 53(1); *Myers,* 157 F.3d at 76. However, a narrow exception exists to this general rule, which provides that when a district attorney makes a determination to prosecute or not to prosecute a criminal matter, he or she acts in a quasi-judicial capacity and represents the State, not the County. *See Baez v. Hennessy,* 853 F.2d 73 (2d Cir.1988); *see also Myers,* 157 F.3d at 76; *Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir.1993). Thus, the County cannot be held liable for the actions of Rice, if any, in the decision not to prosecute Penna.

However, to the extent plaintiff's *Monell* claims are based on the administration of the district attorney's office, the district attorney is treated not as a state official, but rather as an official of the municipality to which he or she is assigned. *Gan,* 996 F.2d at 536; *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir.1992).* Thus, to the extent plaintiff's complaint alleges that the district attorney's office had a policy of suborning perjury, ignoring evidence of police misconduct and sanctioning and concealing police misconduct or wrongdoing, Rice may be considered a county policymaker for whose actions the county may be held liable. *See, e.g. Myers,* 157 F.3d at 77 (finding that where a district attorney implements an unconstitutional policy directing a police department and assistant district attorneys not to entertain cross-complaints, that policy is imputed to the county); *Gentile v. County of Suffolk,* 926 F.2d 142, 152 n. 5 (2d Cir.1991) (holding that a municipality could be held liable upon the county's long history of negligent disciplinary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs).

b. Liability based Upon Schwartz's Conduct

**\*4** Municipal liability may not be based solely on the misconduct of non-supervisory employees. *See Monell, 436 U.S. at 691, 98 S.Ct. 2018.* "[O]nly actions by officials relatively high up in the municipal hierarchy will produce municipal liability." *Walker, 974 F.2d at 297.1992).* Whether an official has final policymaking authority is a question of law for the court. *See Jett v. Dallas Independent School District, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).* "An official has final [policymaking] authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir.2003).*

Plaintiff has not alleged that Schwartz, as opposed to Rice, had any policymaking role in the district attorney's office, or that the actions he took in declining to prosecute plaintiff's misdemeanor complaints were undertaken in any supervisory capacity. Accordingly, Schwartz's alleged actions cannot be said to represent the actions of a policymaker responsible for the alleged policy that caused plaintiff's constitutional deprivation. *See, e.g. Feerick v.. Sudolnik, 816 F.Supp. 879, 886–887 (S.D.N.Y.1993), aff'd, 2 F.3d 403 (2d Cir.1993)* (dismissing the plaintiff's claims against the assistant district attorneys on the basis that they were not municipal policymakers); *Peterson v. Tomaselli, 469 F.Supp.2d 146, 169–170 (S.D.N.Y.2007)* (granting summary judgment as to the plaintiff's claims of municipal liability based on the actions of the assistant district attorney). Therefore, to the extent plaintiff's claims of municipal liability are based on the actions of Schwartz, those claims are dismissed.

2. Official Capacity Claims

a. Eleventh Amendment

To the extent plaintiff's claims against Rice in her official capacity are based on allegations that she was implicated in the decision not to prosecute Penna, those claims are barred by the Eleventh Amendment. The

Eleventh Amendment of the United States Constitution bars suits for damages in a federal court by private parties against a state or one of its agencies, absent consent to suit or an express statutory waiver of immunity. *Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 362, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).* Moreover, a suit against a state official in his or her official capacity is not a suit against the official personally, but rather is a suit against the official's office, and thus, is no different from a suit against the State itself. *Will v. Michigan Department of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).* Since the State of New York has not consented to suit in federal court, *see, e.g. Le Grand v. Evan, 702 F.2d 415, 417 (2d Cir.1983)* (holding that by virtue of the Eleventh Amendment, the State of New York is immune from a suit for damages under *section 1983*), plaintiff's claims against Rice in her official capacity are barred by the Eleventh Amendment. *See, e.g. Gan, 996 F.2d at 536* (holding that to the extent the complaint alleged that the District Attorney was implicated in the decision not to bring criminal charges, he was properly deemed to be an official of New York State and was entitled to invoke Eleventh Amendment immunity).

b. Remaining Official Capacity Claims

**\*5** "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell, 436 U.S. at 691, 98 S.Ct. 2018.* "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as 'redundant and an inefficient use of judicial resources.' " *Escobar v. City of New York, No. 1:05–cv–3030, 2007 WL 1827414, at \* 3 (E.D.N.Y. June 25, 2007)* (citing cases). Since the County is named in the complaint, the claims against Rice and Schwartz, in their official capacities, are dismissed as duplicative and redundant. *See, e.g. Drees v. County of Suffolk, No. 06–CV–3298, 2007 WL 1875623, at \* 19 (E.D.N.Y. June 27, 2007)* (dismissing the claims against the individual defendants in their official capacities as duplicative of the *Monell* claim against the County); *Olson*

Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

*v. State of New York,* No. 04–CV–0419, 2005 WL 5885368, at * 2 (E.D.N.Y. Mar. 9, 2005).

3. Immunity

Prosecutors enjoy absolute immunity from liability under Section 1983 in suits seeking damages for acts carried out in their prosecutorial capacities. *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001); *Dory v. Ryan,* 25 F.3d 81 (2d Cir.1994), including the decision to withhold or commence a prosecution. *See Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) (holding that the prosecutor has absolute immunity for the initiation and conduct of a prosecution unless he proceeds in the clear absence of all jurisdiction; *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1148 (2d Cir.1995) ("absolute immunity extends to those acts, whether in or out of the courtroom, 'which occur in the course of the [prosecutor's] role as an advocate for the State' ") (internal citation omitted). Once absolute immunity attaches, it "attaches to [the prosecutor's] function, not the manner in which he performed it. * * * Accordingly, a prosecutor's motivation, and whether preferable alternatives to the actions taken were available, are irrelevant." *Parkinson,* 238 F.3d at 150 (internal quotations and citations omitted); *see also Shmueli,* 424 F.3d at 237 (holding that once the court determines that the challenged prosecution was not clearly beyond the prosecutor's jurisdiction, the prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive). To the extent plaintiff s claims against Rice and Schwartz relate to the performance of tasks undertaken by them as advocates of the State, they were not undertaken in a complete absence of all jurisdiction and, thus, Rice and Schwartz are immune from suit.

4. First Amendment Claims

**\*6** In any event, plaintiff's First Amendment claims fail because the alleged conduct of Rice, Schwartz and the County has not deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. To state a claim under Section 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color

of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"Criminal prosecutions are within the exclusive province of the public prosecutor who has complete discretion over the decision to initiate, continue or cease prosecution." *Yashaahla v. M.H.A.N.Y,* No.05–CV–4963, 2006 WL 845586, at *1 (E.D.N.Y. Mar. 29, 2006) (citations omitted). A private citizen does not have a constitutional right to initiate or to compel the initiation of criminal proceedings against another individual. *See Leeke v. Timmerman,* 454 U.S. 83, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981); *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Ostrowski v. Mehltretter,* 20 Fed. Appx. 87 (2d Cir.2001). This considered, it is clear that Rice's, Schwartz's and the County's alleged actions (or inactions) in no way infringed upon any of plaintiff's First Amendment rights. *See Price v. Hasly,* No. 04–CV–90S, 2004 WL 1305744, at *2 (W.D.N.Y. June 8, 2004); *Lis v. Leahy,* No. 90–CV–834E, 1991 WL 99060, at *1 (W.D.N.Y. June 3, 1991). Therefore, plaintiff cannot maintain a Section 1983 action against any of the defendants with respect to his First Amendment claims. Accordingly, plaintiff's First Amendment claims are dismissed in their entirety.

5. Equal Protection Claims

Likewise, plaintiff has not stated a viable equal protection claim. To establish an equal protection violation, a plaintiff must show purposeful discrimination by the defendants directed at an identifiable or suspect class. *See, Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995). Although an equal protection violation may be based on a "class of one, where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *see, Kramer v. City of New York,* No. 04 Civ. 106, 2004 WL 2429811, at * 5 (S.D.N.Y. Nov. 1, 2004) (citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 [2000] ), plaintiff has failed to allege any such unequal treatment. Plaintiff's failure to allege that he was treated differently from similarly situated individuals is fatal to his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)

(Cite as: 2008 WL 111187 (E.D.N.Y.))

equal protection claim. *See, Jackson v. Mann,* 196 F.3d 316, 321 (2d Cir.1999); *see also Caracciola v. City of New York,* No. 95 Civ. 3896, 1999 WL 144481, at * 6 (S.D.N.Y. Mar. 17, 1999) (holding that plaintiffs' equal protection claims were frivolous where they failed to allege that they were members of a protected group, and they failed to relate specific instances where other persons similarly situated were treated differently or where they were singled out for unlawful treatment). Accordingly, plaintiff's equal protection claims are dismissed in their entirety.

III. Conclusion

**\*7** For the reasons stated herein, the County defendants' motion is granted and the complaint is dismissed in its entirety.

SO ORDERED.

E.D.N.Y.,2008.

DeJean v. County of Nassau
Not Reported in F.Supp.2d, 2008 WL 111187 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.
Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

*1 On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.[FN1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

FN1. The claims brought by the plaintiff that
survived summary judgment were tried before a
jury on October 4, 1998. On October 6, 1998,
the jury returned a verdict for LaBounty on his
claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. LaBounty v. Kinkhabwala, No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. LaBounty v.
Coombe, et al., No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.[FN2]

FN2. To the extent that the plaintiff reiterates in
his opposition claims that have been previously
dismissed or makes new claims unrelated to the
issues which have been remanded, those claims
are not properly before this Court and the Court
does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.3d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).
*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d- 2001 WL 457767, at *7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at *8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:

(a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.

(b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.

(c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> **FN7.** The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> **FN8.** The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> **FN9.** The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider

the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety.[FN1] Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

FN1. Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." _Shrader v. CSX Transp., Inc.,_ 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." _In re C–TC 9th Ave. P'ship,_ 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, _Von Ritter v. Heald,_ 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." _Fogel v. Chestnutt,_ 668 F.2d 100, 109 (2d Cir.1981).

### 1. Discovery Matters

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

### 2. Defendant Baker

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. _See Barr v. Abrams,_ 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

3. *Defendant Barkley*

**3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).

Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5– *6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards.*" *Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff is inappropriate. *See id.* at 394. The Court held that

[t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

*Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense." ' *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at *6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

> *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at [*]6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at [**]2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned.'" *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at [**]2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible.'" *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

**\*9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Prince PILGRIM, Plaintiff,
v.
P. BRUCE, Correction Officer, Great Meadow C.F.;
Murphy, Sergeant, Great Meadow C.F.; Harvey,
Hearing Officer, Great Meadow C.F.; Gary Greene,
Superintendent, Great Meadow C.F.; Glenn Goord,
Commissioner of Docs; and Donald Selsky, Director of
Docs Special Housing/Inmate Discipline Program,
Defendants.
Civil Action No. 9:05-cv-198 (GLS/GHL).

May 7, 2008.
Prince Pilgrim, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Steven H. Schwartz, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### ORDER

GARY L. SHARPE, District Judge.
    **\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
George H. Lowe, duly filed February 21, 2008. Following
ten days from the service thereof, the Clerk has sent the
file, including any and all objections filed by the parties
herein.

    No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation
for clear error, it is hereby

    ORDERED, that the Report-Recommendation of
Magistrate Judge George H. Lowe filed February 21, 2008
is ACCEPTED in its entirety for the reasons state therein,
and it is further

    ORDERED, that Plaintiff's cross-motion (Dkt. No.

41) is DENIED to the extent that it requests relief that is
dispositive in nature such as the voluntary dismissal
without prejudice of plaintiff's "defamation of character"
and "[loss of] religious services" claims, and it is further

    ORDERED, that Defendants' motion for summary
judgment (dkt.No.38) is GRANTED and that all of the
claims asserted in Plaintiff's Amended Complaint (Dkt.
No. 9) is DISMISSED with prejudice, and it is further

    ORDERED, that the court certifies in writing, for the
purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken
from this order in this action would not be taken in good
faith, and it is further

    ORDERED, that the Clerk enter judgment in favor of
the defendants against the plaintiff.

    IT IS SO ORDERED

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.
    This *pro se* **prisoner** civil rights action has been
referred to the undersigned for Report and
Recommendation by the Honorable Gary L. Sharpe,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. Currently pending before the Court
is Defendants' motion for summary judgment, and
Plaintiff's cross-motion for an Order (1) reopening the
discovery period in this action so that Plaintiff may serve
interrogatories on Defendants, (2) adjourning the Court's
decision regarding Defendants' motion, pending Plaintiff's
receipt their responses to his referenced interrogatories, as
well as responses to various outstanding discovery
demands, (3) imposing sanctions against Defendants for
intentionally failing to provide Plaintiff with the discovery
mandated by the Court's discovery order of March 14,
2007, and (4) permitting Plaintiff to withdraw his claims
of defamation and interference with his right to participate
in religious services. (*Id.*) (Dkt.Nos.38, 41.) For the
reasons set forth below, I deny Plaintiff's cross-motion to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

the extent that it requests non-dispositive relief, I recommend that the Court deny Plaintiff's cross-motion to the extent that it requests dispositive relief, and I recommend that the Court grant Defendants' motion for summary judgment with regard to all of the claims asserted in Plaintiff's Amended Complaint.

## I. BACKGROUND

### A. Plaintiff's Claims

*2 Prince Pilgrim ("Plaintiff") filed his Complaint in this action on February 14, 2005, and his Amended Complaint on July 18, 2005. (Dkt.Nos.1, 9.) Generally, in his Amended Complaint, Plaintiff alleges that, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow C.F.") between December of 2003 and June of 2004, six employees of the New York State Department of Correctional Services ("DOCS") [FN1] violated his constitutional rights in a variety of ways, all revolving around a false and retaliatory misbehavior report that was filed against Plaintiff which, after an allegedly procedurally defective disciplinary hearing, resulted in a disciplinary conviction and punishment. (*See generally* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

> FN1. These six employees are as follows: (1) Phillip Bruce, a correction officer at Great Meadow C.F., (2) B. Murray, a sergeant at Great Meadow C.F., misidentified by Plaintiff as Sergeant "Murphy," (3) Andrew Harvey, a hearing officer at Great Meadow C.F. (4) Gary Greene, the Great Meadow C.F. Superintendent, (5) Glenn Goord, the DOCS Commissioner, and (6) Donald Selsky, the Director of the DOCS Special Housing/Inmate Grievance Program. (Dkt. No. 9, Part 1 [Plf.'s Am. Compl.]; Dkt. Nos. 16, 17, 19 [Acknowledgments of Service for Defs. Harvey, Murray, and Bruce].)

More specifically, Plaintiff alleges as follows:

(1) **Defendant Phillip Bruce** (a correctional officer) violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments by (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003, (2) "singl [ing]" Plaintiff out of a group of inmates going to

recreation on February 22, 2004, (3) "conspir[ing]" with and "instruct[ing] a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, (4) "singl[ing]" him out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004, and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004 (*id.* at ¶¶ 1, 5, 8-11, 13, 27);

(2) **Defendant B. Murray** (a correctional sergeant, misidentified by Plaintiff as Sergeant "Murphy") violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by deliberately failing to provide Plaintiff with adequate legal assistance before, and during, Plaintiff's disciplinary hearing on March 22, 2004, and March 26, 2004 (*id.* at ¶¶ 13-16, 19-20, 29);

(3) **Defendant Andrew Harvey** (a hearing officer) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) failing to ensure that Defendants provided Plaintiff with all documents necessary to marshal a defense at his disciplinary hearing, (b) failing to grant him an extension of time to prepare for the hearing, (c) failing to dismiss the charges against Plaintiff due to the lack of legal assistance he had received, (d) failing to conduct a hearing within seven days of the incident, (e) fabricating an "extension request," which falsely stated that Plaintiff had requested an extension of time before the hearing so that he could meet with his legal assistant, (f) failing to conduct a fair and impartial hearing on March 22, 2004, and March 26, 2004, (g) failing to sustain Plaintiff's objection to the use of Defendant Bruce as a witness at the hearing, (h) wrongfully convicting Plaintiff of the offenses with which he had been charged, and (i) imposing on Plaintiff an overly harsh disciplinary sentence (*id.* at ¶¶ 19-20, 22-24, 31);

*3 (4) **Defendant Gary Greene** (the Great Meadow C.F. Sperintendent) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) "engaging [in] and influencing a predetermination of guilt[ ]" with respect to disciplinary charges pending against Plaintiff by "moving [him] unlawfully to long term keep lock housing" on March 19, 2004 (three days before his disciplinary hearing commenced), or at least failing to rectify that unjustified transfer after learning about it through a letter from Plaintiff (*id.* at ¶¶ 1-2, 6-7, 12, 16-19, 21, 33);

(5) **Defendant Glenn Goord** (the DOCS Commissioner) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) failing to reverse Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 5, 8, 12, 25, 35); and

(6) **Defendant Donald Selsky** (the Director of the DOCS Special Housing/Inmate Grievance Program) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by failing to reverse Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 25, 37).

Finally, Plaintiff alleges that each of the six Defendants, through their various forms of misconduct, caused Plaintiff to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

**B. Defendants' Motion and Plaintiff's Cross-Motion**

Defendants filed their motion for summary judgment on August 30, 2007. (Dkt. No. 38.) Generally, Defendants' motion for summary judgment is premised on eight grounds: (1) Plaintiff's asserted failure to exhaust his available administrative remedies with regard to various of his claims prior to filing this action in federal court; (2) Plaintiff's asserted failure to state an actionable claim of defamation; (3) Plaintiff's asserted failure to state an actionable claim of the denial of his right to participate in religious services; (4) Plaintiff's asserted failure to state an

actionable claim of conspiracy; (5) Plaintiff's asserted failure to allege facts plausibly suggesting, or adduce evidence establishing, the personal involvement of Defendant Greene (a supervisor) in any of the constitutional violations alleged; (6) the protection from liability that Defendants Goord, Greene, Selsky, Harvey and Murphy assertedly enjoy under the circumstances, pursuant to the doctrine of qualified immunity; (7) Plaintiff's asserted failure to state an actionable due process claim due to his failure to allege facts plausibly suggesting that he enjoyed a protected **liberty interest** in remaining free from the disciplinary confinement alleged; and (8) Plaintiff's asserted failure to adduce evidence establishing a claim of retaliation by Defendant Bruce. (Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

**\*4** Defendants' motion included a detailed notification of the consequences of failing to respond to their motion. (Dkt. No. 38, Part 1.) Plaintiff clearly read, and understood, this notification since he requested (and was granted) a liberal extension of the deadline by which he had to respond to Defendants' motion. (Dkt. No. 40 [Request and Order granting Plf. a 54-day extension of the response deadline].) Moreover, Plaintiff, who is no stranger to the court system, had (when he filed his response papers in this action) previously faced at least five motions for summary judgment, and responded to at least four of those motions, in other **prisoner** civil rights cases.[FN2] Moreover, when Plaintiff received a copy of Defendants' motion for summary judgment, he was (and is still) incarcerated in a New York State correctional facility whose law library contains a copy of both the Local Rules of Practice for this Court and this District's *Pro Se* Manual, both of which advise *pro se* **prisoner**-plaintiffs of the consequences of failing to properly oppose a defendant's motion for summary judgment.

FN2. *See, e.g., Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 9/23/02); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff had to, but failed to, respond to defendants' motion for summary judgment by 1/31/03); *Pilgrim v. Luther,* 01-CV-8995 (S.D .N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

two motions for summary judgment on 5/24/02, 7/16/02, and 10/14/04); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 4/29/05).

Despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. Rather, on November 41, 2007, Plaintiff filed "response" papers that contained a cross-motion. (Dkt. No. 41.) The cross-motion requested four types of relief from the Court: (1) the reopening of the discovery period in this action so that Plaintiff may serve interrogatories on Defendants; (2) an adjournment of the Court's decision regarding Defendants' motion, pending Plaintiff's receipt of their responses to his referenced interrogatories, as well as responses to various outstanding discovery demands; (3) the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007; and (4) the withdrawal of his claims of defamation and interference with his right to participate in religious services. (*Id.*)

**II. ANALYSIS**

**A. Plaintiff's Cross-Motion**

**1. Request for Reopening of Discovery**

Plaintiff requests to reopen discovery in this action so that he can file various interrogatories. (Dkt. No. 41.) I deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7, 16, 26 and/or 33.

Among other things, Plaintiff has not identified (1) what information he would attempt to elicit from Defendants through his interrogatories (*see* Dkt. No. 41), (2) why he needs that information (*id.*), or (3) why he delayed in making a motion to reopen discovery until now–approximately *ten months* after the close of discovery in this action, which occurred on April 14, 2007 (*see* Dkt. No. 26 [Order filed 10/30/06, resetting deadline for close of discovery as 1/17/07]; Dkt. No. 32[Order filed 3/14/07,

directing Defs. to respond to Plf.'s outstanding discovery requests by 4/14/07]; Dkt. No. 33 [Defs.' Status Report filed 4/12/07, attaching copies of discovery provided to Plf.] ).

**\*5** I note that the one-page letter that Plaintiff submitted to the Court on or about August 30, 2007, requesting an extension of 60 days by which to file a motion to compel Defendants to produce documents in response to Plaintiff's outstanding discovery demands did *not* constitute a motion to reopen discovery in this action so that Plaintiff could serve interrogatories on Defendants. (Dkt. No. 39.)

**2. Request for Stay of Decision Regarding Summary Judgment Motion**

Plaintiff also requests an adjournment of the Court's decision regarding Defendants' motion for summary judgment pending Plaintiff's receipt of his outstanding discovery demands. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 56(f).

Rule 56(f) provides as follows:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). "To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004) [citation omitted], *accord, Concourse Rehab. & Nursing Ctr. Inc. v. Whalen,* 249 F.3d 136, 146, n. 3 (2d Cir.2001) [citation omitted].

Here, Plaintiff has failed to satisfy the first, second,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

and third requirements. First, Plaintiff has failed to demonstrate precisely which of his discovery demands are allegedly outstanding. (*See* Dkt. No. 41) I have *sua sponte* compared Defendants' supplemental discovery responses and my discovery Order of March 14, 2007, and I am unable to find any reason to believe that Defendants' supplemental discovery responses were deficient in any regard. (*Compare* Dkt. No. 33, Parts 3-6 [Defs.' Status Report] *with* Dkt. No. 32 [Order].) I note that, taking into account the 89 pages of documents that Defendants provided to Plaintiff on April 12, 2007, Defendants have now provided Plaintiff with some 171 pages of documents in response to his discovery demands. (*See* Dkt. No. 33, Parts 4, 6.) Despite his possession of these documents, he has adduced no evidence in opposition to Defendants' motion for summary judgment.

Second, Plaintiff has not demonstrated how the (unidentified) information sought is reasonably expected to create a genuine issue of material fact on any of the issues presented by Defendants' on their motion. An opposing party's "mere hope" that further evidence may develop to create a genuine issue of fact is an insufficient basis upon which to justify the granting of such a stay. *Contemporary Mission, Inc. v. USPS,* 648 F.2d 97, 107 (2d Cir.1981) [citation omitted]; *accord, Sanders v. Quickstak, Inc.,* 889 F.Supp. 128, 132 (S.D.N.Y.1995); *Witter v. AbbellHowe Co.,* 765 F.Supp. 1144, 1150 (W.D.N.Y.1991); *Dixon v. Bowen,* 126 F.R.D. 483, 486 (S.D.N.Y.1989). Here, a "mere hope" of such further evidence is all that Plaintiff has offered.

**\*6** Moreover, I note that Defendants' motion-although it is submitted as a "motion for summary judgment" under Fed.R.Civ.P. 56-is almost entirely based on arguments that Plaintiff's Amended Complaint *fails to state a claim upon which relief may be granted* under Fed.R.Civ.P. 12(b)(6). (*See generally* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].) Of course, such arguments are entirely permissible under Fed.R.Civ.P. 56,[FN3] and the issues presented by such arguments are purely legal in nature and in no way evidentiary in nature (all material facts alleged in Plaintiff's Amended Complaint being accepted as true, and all reasonable inferences construed in Plaintiff's favor).[FN4] As a result, it would appear *extremely* unlikely that any further evidence developed by Plaintiff during

discovery could defeat the vast majority of Defendants' arguments, which, again, are based on the factual assertions contained within the four corners of Plaintiff's Amended Complaint.

FN3. *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.") [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

FN4. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

Third, Plaintiff has failed to explain why he delayed approximately four-and-a-half months in complaining about the discovery responses Defendants sent Plaintiff on April 12, 2007, causing Defendants to go to the effort and expense of preparing and filing a motion for summary judgment on August 30, 2007. (*See* Dkt. No. 41; *compare* Dkt. No. 33, Part 2 [Defs.' Status Report filed 4/12/07, attaching Declaration of Service.] *with* Dkt. No. 39 [Plf.'s Request dated 8/30/07, asking for an "extension" of the deadline by which he must file a motion to compel].) I note that the docket is conspicuously absent of any motion to compel, or motion for sanctions, by Plaintiff during the referenced four-and-a-half-month period. (*See generally* Docket Sheet.)

**3. Request for Sanctions**

Plaintiff also requests the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 16, 26, and/or 37. I note that, as explained above in Part II.A.2. of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

this Order and Report-Recommendation, Plaintiff has not even shown that Defendants indeed failed to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007. He certainly has not shown that any such failure was willful. Under the circumstances, I find that this request is so lacking in merit as to be frivolous.

**4. Request to Withdraw Two Claims**

Finally, Plaintiff requests the withdrawal of his claims of defamation and interference with his right to participate in religious services. (Dkt. No. 41.) The relief requested in this portion of Plaintiff's cross-motion (i.e., dismissal) is dispositive in nature. However, the dismissal requested by Plaintiff is *voluntary* in nature. Authority exists for the proposition that a magistrate judge may decide such a request without issuing a report-recommendation.[FN5] However, out of an abundance of caution, I will express my conclusion with regard to this request as part of a recommendation to District Judge Sharpe, rather than as an Order.

> FN5. *See* 28 U.S.C. § 636(b)(1)(A) (providing that a district judge "may designate a magistrate to hear and determine any pretrial matter," with certain enumerated exceptions-including a decision on a motion "to *involuntarily* dismiss an *action*").

**\*7** Plaintiff's request, which is more properly construed as one for voluntary dismissal of these two claims without prejudice, is governed by, or at least guided by, Fed.R.Civ.P. 41(a). I say "guided" because Fed.R.Civ.P. 41(a) speaks of the dismissal of "actions," not "claims." In any event, under the principles set forth by that Rule, since Defendants have already filed an Answer in this action, Plaintiff may not obtain the dismissal of the two claims without either (1) a stipulation of dismissal signed by all parties who have appeared in the action (which he has not filed), or (2) an Order of the Court issued "upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(1),(2).

Simply stated, I do not believe it would be at all proper to permit Plaintiff to expressly assert claims of "defamation of character" and interference with his right to "religious services,"[FN6] sit idly by as Defendants defend

themselves against those claims,[FN7] and then snatch those claims from the jaws of Defendants' properly filed and facially meritorious motion for summary judgment, just so that this extremely litigious plaintiff may again assert them in another action. The claims have been litigated and should be decided.

> FN6. In his Amended Complaint, filed on June 18, 2005, Plaintiff expressly alleges that each of six Defendants, through their various forms of misconduct, caused Plaintiff to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].)

> FN7. I note that in their Answer, filed on February 16, 2006, Defendants interposed defenses regarding, *inter alia,* Plaintiff's Amended Complaint to the extent that it asserted "state law claims" and claims for "mental or emotional injury." (Dkt. No. 21, Part 1, ¶¶ 15, 23 [Defs.' Answer to Plf.'s Am. Compl.].) Even if Plaintiff did not appreciate the reasonable meaning of the words he expressly used in his Amended Complaint, these defenses should have alerted him as to the way in which Defendants were reasonably interpreting those words, and the effort and expense to which the words put them during discovery. I note also that the discovery period in this action was more than a year long. (*Compare* Dkt. No. 23 [Pretrial Scheduling Order filed 4/10/06, initially setting discovery deadline as 10/30/06] *with* Dkt. No. 32 [Order filed 3/14/07, extending deadline by which Defs. had to respond to Plf.'s outstanding discovery demands to 4/14/07].)

For these reasons, I recommend that the Court deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7(b) and 41(a)(2).

**B. Defendants' Motion for Summary Judgment**

**1. Legal Standard Governing Unopposed Motion for Summary Judgment**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN9]

> FN8. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN9. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN10] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN11] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN12]

> FN10. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986).

> FN11. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN12. *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to properly respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." [FN13] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants.[FN14] However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

> FN13. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996).

> FN14. *See Champion*, 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*8** More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN15] to the extent that (1) those facts are supported by the evidence in the record,[FN16] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the consequences of failing to respond to the movant's motion for summary judgment.[FN17]

> **FN15.** *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> **FN16.** *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely

solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, 2002 WL 449757 at *2-3 (N.D.N.Y. Mar. 18, 2002)* (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

> **FN17.** *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

Local Rules of Practice for this Court.[FN18] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.*[FN19] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest."[FN20]

FN18. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to

exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN19. *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN20. *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by 983 F.Supp. 595 (N.D.N.Y.1996)* (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN21]

> [FN21.] *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, 2006 WL 395269, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

**2. First Ground for Dismissal of Plaintiff's Amended Complaint: Facial Merit of Defendants' Unopposed Motion for Summary Judgment**

As an initial matter, I find that Defendants' motion papers were "properly filed" for purposes of Local Rule 7.1(b)(3). N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown."). For example, their Statement of Material Facts-to the extent one is even needed to decide Defendants' arguments that Plaintiff has failed to state a claim upon which relief may be granted-contains 16 assertions of fact, each of which is supported by an accurate record citation. (*See* Dkt. No. 38, Part 2 [Defs.' Rule 7.1 Statement].) Moreover, Defendants' motion is, as it must be, supported by a memorandum of law that contains a table of contents and citations to legal authorities, and that does not exceed 25 pages in length. (Dkt. No. 38, Part 15 [Defs.' Memo. of Law.])

Moreover, I find that Plaintiff was advised of the consequences of failing to properly respond to Defendants' motion for summary judgment and, clearly, he understood those consequences, for the reasons stated above in Part I.B. of this Order and Report-Recommendation. However, despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. (Dkt. No. 41.)

**\*9** As a result, the only issue remaining before the Court is whether the legal arguments advanced in Defendants' Memorandum of Law are *facially meritorious.*[FN22] After reviewing these legal arguments, and the undisputed facts upon which they rely, I find that each of these legal arguments is, at the very least, facially meritorious, for the reasons stated by Defendants in their Memorandum of Law. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law.].) I note that several cases exist from this District granting summary judgment against a *pro se* litigant based on a similar facial analysis of Defendants' unopposed motion papers.[FN23]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

FN22. *See, supra,* note 19 of this Order and Report-Recommendation.

FN23. *See, e.g., Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], and recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

For these reasons, I recommend that the Court grant Defendants' motion for summary judgment.

**3. Alternative Ground for Dismissal of Plaintiff's Amended Complaint**

Because I have already found that an adequate ground exists upon which to base a recommendation that Plaintiff's Amended Complaint be dismissed, I do not believe there is a need to proceed to a more in-depth analysis of Defendants' arguments in favor of dismissal. Furthermore, I recommend that the Court decline to *sua sponte* conduct such a detailed analysis, especially given the backlog of **prisoner** civil rights cases on its docket.[FN24] However, in the interest of aiding the Court should it decide to conduct such an analysis, I have subjected Defendants' legal arguments to the more rigorous scrutiny that would be appropriate on a contested motion, and I find that I am persuaded by those legal arguments, which I list and discuss below. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

FN24. I note that the Second Circuit had, between 2000 and 2005, the longest median time

to disposition for **prisoner** civil rights cases, among the twelve circuits (including the D.C. Circuit)-specifically, 9.8 months, as compared to a national average of 5.7 months.

**(i) Plaintiff's Asserted Failure to Exhaust His Available Administrative Remedies with Regard to Various of His Claims Prior to Filing this Action in Federal Court**

Defendants accurately describe the Prison Litigation Reform Act's exhaustion requirement, and New York State DOCS' formal grievance process. (*See* Dkt. No. 38, Part 15, at 2-5 [Defs.' Memo. of Law] .) For the sake of brevity, I will not repeat these well-known points of law. I will only add that the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a **prisoner** has failed to exhaust his available administrative remedies, as required by the PLRA.[FN25] *First,* "the court must ask whether [the] administrative remedies [not pursued by the **prisoner**] were in fact 'available' to the **prisoner**."[FN26] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [ **prisoner's**] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN27] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the **prisoner's** failure to comply with the administrative procedural requirements."[FN28]

FN25. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

FN26. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN27. *Id.* [citations omitted].

FN28. *Id.* [citations and internal quotations omitted].

**\*10** Here, Defendants essentially argue that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

administrative remedies were available to Plaintiff, but he failed to pursue (and exhaust) them. (Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) Defendants further argue that no special circumstances exist justifying this failure. (*Id.* at 8.)

Although I agree with the main thrust of this argument (i.e., that several of Plaintiff's claims should be dismissed due to Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I disagree somewhat with Defendants' reasoning. Specifically, I disagree with Defendants' argument to the extent that it is based simply on the allegations of Plaintiff's Amended Complaint (i.e., on a failure-to-state-a-claim analysis).

For some years now, it has been the majority rule (followed by the Second Circuit) that a **prisoner's** fulfillment of his duty to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the **prisoner** had to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment pursuant to Fed.R.Civ.P. 56, or a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12[b][1] ) established by the PLRA. *See, e.g., Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("Because, under the PLRA, a **prisoner** must exhaust administrative remedies before filing a **§ 1983** suit ..., a defendant in a **prisoner** **§ 1983** suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999) ("A court may not dismiss for failure to exhaust administrative remedies unless the court determines that such remedies are available. Snider's answers [on a form complaint] cannot establish that.").

Last year, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in **prisoner** civil rights case. *See Jones v. Block,* 549 U.S. 199, 127 S.Ct. 910, 914-915, 918-923, 166 L.Ed.2d 798 (2007). A **prisoner** has no independent *duty* to plead facts plausibly suggesting that he exhausted

his available administrative remedies, in order to state an actionable claim under 42 U.S.C. § 1983. *Block,* 127 S.Ct. at 919-21. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 921. If a **prisoner** *chooses* to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his Complaint may be dismissed for failure to state a claim. *Id.* at 920-21.

Simply stated, if a **prisoner** says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a Fed.R.Civ.P. 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes. I find that this is *not* what has happened here. While Plaintiff alleges that he sent various officials letters of complaint about certain actions (allegedly) taken by Defendant Bruce, Plaintiff (an experienced litigant and drafter of pleadings) has remained reticent or outright silent about any efforts he did or did not take to appeal the denial of any grievance or complaint to CORC. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

*\*11* Fortunately for Defendants, they also assert an argument based on the uncontroverted record evidence in this action (i.e., on a summary-judgment analysis). Specifically, they argue that the uncontroverted record evidence in this action establishes that Plaintiff never appealed to CORC the denial of any grievances regarding several of his claims against Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) In support of this argument, Defendants have adduced the Declaration of Karen R. Bellamy, the Director of the Inmate Grievance Program for the New York State DOCS. (Dkt. No. 38, Part 9 [Decl. of Bellamy].) Exhibit 1 to that Declaration attaches a computer printout demonstrating that Plaintiff never appealed to CORC the denial of any grievances regarding the following four claims: (1) Defendant Bruce's (alleged) refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

services. (*Id.* at ¶ 3 [citing, and attaching, Ex. 1 to Decl. of Bellamy].) [FN29]

> [FN29.] As for Plaintiff's claims regard the (allegedly) harassing pat-frisks on March 10 and 11, 2004, the computer printout provided by Ms. Bellamy does indicate that, on March 13, 2003, Plaintiff filed a grievance at Great Meadow C.F. (GM-34283-03) entitled "Moorish Pat Frisk." (*Id.* at 4 [Ex. 1 to Decl. of Bellamy].) Of course, I am giving Plaintiff the benefit of the doubt here, since the title of his grievance suggests that the pat frisk at issue was objectionable because of it was due to Plaintiff's apparent Muslim religion, and not due to Plaintiff's having filed grievances against Defendant Bruce.

I note that the computer printout establishes that, during the 2002-2003 period, the grievance procedure at Great Meadow C.F. was working properly so as to be *available* to Plaintiff. I note also that no record evidence (nor even a conclusory allegation) exists suggesting that any Defendant in this matter, through his own actions, inhibited Plaintiff's exhaustion of remedies so as to *estop* that Defendant from raising Plaintiff's failure to exhaust as a defense. Finally, I note also that no record evidence exists supporting a conclusion that any *special circumstances* existed that justified any attempts by Plaintiff to appeal the denial of any complaint to *Defendant Goord* rather than to *CORC,* as is required by 7 N.Y.C.R.R. §§ 701.5(d), 701.8(g),(h). [FN30]

> [FN30.] (*See, e.g.,* Dkt. No. 38, Part 7, at 10-11 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Goord regarding Defendant Bruce's alleged misconduct on 2/22/04]; Dkt. No. 38, Part 8, at 3-4 [Ex. F to Defs.' Motion, attaching Plf.'s letter of 3/11/04 to Def. Goord regarding "harassment & unlawful discrimination" by Def. Bruce].)

Based on the current record, I find that the uncontroverted record evidence establishes that, before filing this action in federal court, Plaintiff failed to exhaust his available administrative remedies regarding the following four claims: (1) Defendant Bruce's (alleged)

refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious services. As a result, I recommend that the Court dismiss those four claims with prejudice.

**(ii) Plaintiff's Asserted Failure to State an Actionable Claim of Defamation**

Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts *plausibly suggesting* [FN31] that any Defendant in this action defamed Plaintiff during the relevant time period. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) Moreover, as Defendants argue, even if Plaintiff had stated a claim for defamation, no reason exists for the Court to assert supplemental jurisdiction over that claim, under the circumstances. (*See* Dkt. No. 38, Part 15, at 8-10 [Defs.' Memo. of Law].) As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's defamation claim with prejudice.

> [FN31.] *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly]* is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

**(iii) Plaintiff's Asserted Failure to State an Actionable Claim of the Denial of His Right to Participate in Religious Services**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

**\*12** Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that any Defendant in this action interfered with Plaintiff's right to participate in religious services. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) As a result, I recommend that, in the alternative, the Court dismiss this claim with prejudice.

**(iv) Plaintiff's Asserted Failure to State an Actionable Claim of Conspiracy Against Defendant Bruce**

As explained above in Part I.A. of this Order and Report-Recommendation, among Plaintiff's claims against Defendant Bruce is a claim that he "conspir[ed]" with and "instructed a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, at Great Meadow C.F. (*See* Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Defendants challenge the pleading sufficiency of this claim to the extent that it alleges a conspiracy by Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 11-12 [Defs.' Memo. of Law].) I agree. Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that Defendant Bruce engaged in a conspiracy with the unidentified corrections officer to harass Plaintiff by subjecting him to a pat-frisk on March 10, 2004. (*See* Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Moreover, I find that Plaintiff's claim fails to the extent he alleges that Defendant Bruce was personally involved in any constitutional violation that occurred with regard to the pat-frisk. As an initial matter, I note that, generally, **prisoners** retain only a limited Fourth Amendment privacy interest in being free from such searches when they walk through the prison doors.[FN32] Plaintiff does not allege that the pat-frisk violated his right to privacy under the Fourth Amendment. Rather, Plaintiff claims that the search was retaliatory in nature, and thus violated his First Amendment rights. The problem is that Plaintiff has alleged no facts in support of his conclusory allegation that Defendant Bruce "instructed" the unidentified corrections officer to perform the pat-frisk. Nor does Plaintiff alleges any facts plausibly suggesting that the pat-frisk (which occurred in a maximum-security correctional facility) would not have occurred even without such an instruction. Thus, Plaintiff fails to allege

facts plausibly suggesting the second and third elements of a retaliation claim (i.e ., the taking of adverse action against the plaintiff *by the defendant,* and a *causal connection* between the plaintiff's protected speech or activity and the taking of the adverse action).[FN33]

FN32. *See Bell v. Wolfish,* 441 U.S. 520, 556-57, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retain[s] necessarily [is] of a diminished scope.").

FN33. To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

I note that, under the circumstances, the Court has the power (and duty) to *sua sponte* address the pleading sufficiency of Plaintiff's other claims, under two authorities: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a **prisoner** proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [ **prisoner's**] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*13** For these reasons, I recommend that the Court dismiss with prejudice both Plaintiff's conspiracy claim regarding the pat-frisk on March 11, 2004, and the retaliation claim regarding that pat-frisk.

**(v) Plaintiff's Asserted Failure to Allege Facts Plausibly Suggesting, or Adduce Evidence Establishing, the Personal Involvement of Defendant Greene (a Supervisor) in any of the Constitutional Violations Alleged**

Defendants accurately recite the law regarding the personal involvement of supervisory officials in constitutional violations alleged in **prisoner** civil rights actions. (*See* Dkt. No. 38, Part 15, at 12-14 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat these well-known points of law.

In arguing that Defendant Greene was not personally involved in any of the constitutional violations alleged, Defendants employ alternative arguments: (1) Plaintiff has failed to allege facts plausibly suggesting that Defendant Greene was personally involved in any of the constitutional violations alleged; and (2) Plaintiff has failed to adduce any evidence establishing that Defendant Greene was personally involved in any of the constitutional violations alleged. (*Id.*)

I have some reservation accepting the first argument given Plaintiff's allegations in his Amended Complaint that he submitted written complaints to Defendant Greene on three occasions regarding various of the claims at issue in this action, and that Defendant Greene responded in writing to Plaintiff on four occasions. (*See* Dkt. No. 9, Part 1, ¶¶ 1, 2, 5, 6, 7, 12, 17, 18 [Plf.'s Am. Compl., alleging that he submitted written complaints to Def. Greene on or about 12/23/03, 2/22/04 and 3/19/04, and that Def. Greene sent written responses to Plf. on or about 12/26/03, 3/1/04, 3/8/04 and 3/19/04].)

However, I have no reservation accepting the second

argument, given the undisputed record on Defendants' motion for summary judgment. More specifically, I find that no rational fact-finder could conclude from Plaintiff's written communications to Defendant Greene that Defendant Greene was notified that any constitutional violations were occurring.[FN34] Nor could a rational fact-finder conclude from Defendant Greene's (or his subordinates') written communications to Plaintiff that Defendant Greene's response was in any way reckless or even negligent.[FN35] It bears emphasizing that, following his receipt of Plaintiff's letters, Defendant Greene rather promptly assigned the matter to a subordinate officer for investigation, notified Plaintiff of that assignment, and then relied on the results of that subordinate officer's investigation. Defendants have accurately cited authorities supporting the (correct) point of law that a superintendent's adoption of a recommendation by an investigating officer cannot by itself demonstrate that he failed to remedy misconduct. *Shabazz v. Lee,* 03-CV1520, 2007 WL 119429, at \*7, n. 4 (N.D.N.Y. Jan.10, 2007) (Homer, M.J.) [citations omitted]. Finally, I note that the fact that Defendant Greene did not reverse Plaintiff's disciplinary conviction (a conviction, by the way, that was not subsequently overturned on appeal)[FN36] is not evidence of any constitutional violation by Defendant Greene.

FN34. (Dkt. No. 38, Part 6, at 10-11 [Ex. D to Defs.' Motion, attaching Plf.'s letter of 12/23/03 to Def. Greene regarding Def. Bruce's statement to Plf. on 12/23/04 that no notary was available]; Dkt. No. 38, Part 7, at 6-8, 11-13 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Greene regarding his "harassment & unlawful discrimination" against Plaintiff by [1] singling Plaintiff out of a group of inmates going to recreation on 2/22/04, thus preventing him from going to recreation, [2] "illegally" posting a sign on a menu board reading "Bruce Almighty," and [3] "over stepping his duties into other officers' duties," for example, by "commanding two posts" when he is only assigned to one such post; and stating, "[I]f I am attacked by this officer, I will defend my life" and requesting that action be taken "before something serious incidents [sic] occur with myself, this officer, or co-worker"].)

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

FN35. (Dkt. No. 38, Part 6, at 9 [Ex. D to Defs.' Motion, attaching Def. Greene's memorandum of 12/26/03 to Plf., stating "Your 12/23/04 letter to me complaining about security staff has been forwarded to DSS Vanguilder for his investigation and response to you"]; Dkt. No. 38, Part 6, at 2 [Ex. D to Defs.' Motion, attaching Captain Kelly's memorandum of 2/6/04 to Plf., reporting that "Superintendent Greene has referred your recent communication regarding the above subject to me for an investigation and response," and that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no malfeasance by Def. Bruce on 12/23/04]; Dkt. No. 38, Part 7, at 5 [Ex. E to Defs.' Motion, attaching Def. Greene's memorandum of 3/1/04 to Plf., stating "Your 2/22/04 letter to me complaining about C.O. Bruce has been forwarded to DSS Vanguilder for his investigation and response to you. I resent the statement made by you that I or members of the Executive Team have condoned inappropriate behavior. I did not see a sign 'Bruce Almighty' posted in the Mess Hall Foyer and, if I had, I would have assumed it listed the movie to be shown to you by that title. You are extremely paranoid and this latest letter to me borders on threats by you. If I continue to believe you to be a threat here, I will address that issue."]; Dkt. No. 38, Part 7, at 2 [Ex. E to Defs.' Motion, attaching P. Vanguilder's memorandum of 3/12/04 to Plf., reporting that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no harassment by Def. Bruce on 2/22/04] )

FN36. (*See* Dkt. No. 38, Part 5, at 2 [Ex. C to Defs.' Motion, attaching appellate decision dated 6/8/04, by Def. Selsky regarding Plf.'s disciplinary conviction].)

**\*14** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant Greene based on his lack of personal involvement in any

of the constitutional violations alleged.

**(vi) The Protection from Liability that Defendants Goord, Greene, Selsky, Harvey and Murphy Assertedly Enjoy Under the Circumstances, Pursuant to the Doctrine of Qualified Immunity**

Defendants accurately recite the legal standard governing the application of the doctrine of qualified immunity. (*See* Dkt. No. 38, Part 15, at 14-17 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard.

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record that Defendants Goord, Greene, Selsky, Harvey or Murphy violated a clearly established statutory or constitutional right of which a reasonable corrections officer would have known, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 15-17.)

Stated more simply, "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996); *Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]. As the Supreme Court explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendants Goord, Greene, Selsky, Harvey and Murphy based on the doctrine of qualified immunity.

**(vii) Plaintiff's Asserted Failure to State an Actionable**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

**Due Process Claim Due to His Failure to Allege Facts Plausibly Suggesting that He Enjoyed a Protected Liberty Interest in Remaining Free from the Disciplinary Confinement Alleged**

Defendants accurately recite the legal standard governing Plaintiff's due process claim regarding the manner in which his prison disciplinary hearing was conducted. (*See* Dkt. No. 38, Part 15, at 17-21 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize that, in order to establish that he possessed a protected liberty in remaining free from the disciplinary confinement at issue, Plaintiff must establish that the confinement imposed on him *an atypical and significant hardship in relation to the ordinary incidents of prison life.*

Applying this legal standard to the allegations of Plaintiff's Amended Complaint, I agree with Defendants that Plaintiff has failed to allege facts plausibly suggesting that he enjoyed a protected **liberty interest** in remaining free from the **disciplinary** confinement alleged, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 20-21.) Plaintiff alleges that his **disciplinary** conviction resulted in a **sentence** of sixty ( **60) days** of keep-lock confinement and a corresponding loss of privileges. (*See* Dkt. No. 9, Part 1, ¶¶ 24 [Plf.'s Am. Compl.].) More specifically, Plaintiff alleges that the conditions of his keep-lock confinement subjected Plaintiff to the following:

**\*15** [L]ost telephone privileges, commissary privileges, package privileges, special events privileges, regular visits, 23-hour confinement, one (1) Exercise period, three ten-minute showers weekly, deprivation of access to Law library, deprivation of Access to the Courts, Lost [sic] of Sao Shop Industry Program earnings [of] 42 cents an hour, deprivation of paying Court fees, deprivation of paying for copies of legal material, injuring eligibility for constructive transfer, defamation of character, [denial of] **liberty interest** and religious services, and that such lost [sic] was malicious, cruel and unusual punishment ....

(*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

Both the Supreme Court and Second Circuit have made clear that a "short" period of disciplinary confinement (i.e., under 101 days) under generally "normal" conditions (i.e., even if some of those conditions are harsher than those in disciplinary confinement or the general population) usually does not rise to the level of atypicality.[FN37] Here, setting aside the often-conclusory nature of Plaintiff's allegations, the allegations generally state the *ordinary* conditions of disciplinary confinement in a correctional facility within the New York State DOCS. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population **prisoners**, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14). For example, conspicuously missing from this litany are any allegations that, while in keeplock confinement, Plaintiff was denied food, clothing, bedding, heat, running water, toiletries, or medicine. (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

FN37. *See, e.g., Sandlin v. Conner,* 515 U.S. 472, 475-476, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (30 days of disciplinary confinement in SHU under conditions that mirrored those of normal administrative segregation "with insignificant exceptions" did not rise to the level of atypicality); *Sealev v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and somewhat more severe than those of general population" did not rise to the level of atypicality).

For these reasons, I recommend that, in the alternative, the Court dismiss with prejudice Plaintiff's due process claims.

**(viii) Plaintiff's Asserted Failure to Adduce Evidence Establishing a Claim of Retaliation by Defendant**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

**Bruce**

As explained above in Part I.A. of this Order and Report-Recommendation, Plaintiff asserts five discrete instances of retaliation by Defendant Bruce: (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) "conspir[ing]" with and "instruct[ing] a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004; (4) "singl[ing]" Plaintiff out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004; and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004. (*id.* Dkt. No. 9, Part 1, ¶¶ 1, 5, 8-11, 13, 27 [Plf.'s Am. Compl.].)[FN38]

> FN38. I note that Defendants characterize these five discrete claims as *four* discrete claims, after combining the fourth and fifth claims described above into one claim. (Dkt. No. 38, Part 15, at 23-24 [Defs.' Memo. of Law].

**\*16** Defendants accurately recite the legal standard governing Plaintiff's claim of retaliation by Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 21-23 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize two facts a plaintiff must prove by a preponderance of the evidence in order to prevail on a First Amendment claim. First, the plaintiff must prove that the defendant (as opposed to some third-person) took "adverse action" against the plaintiff.[FN39] Second, the plaintiff must prove that there was a causal connection between the protected speech in which the plaintiff was engaging and the adverse action allegedly taken against him-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN40] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN41]

> FN39. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568,

50 L.Ed.2d 471 (1977); *Gill v. Pidylpchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

> FN40. *Mount Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287; *Gill,* 389 F.3d at 380.

> FN41. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record that Defendant Bruce retaliated against Plaintiff, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 23-25.) In particular, Defendants have adduced record evidence establishing, among other things, that (1) no notary was on duty at Great Meadow C.F. on December 23, 2003, (2) Defendant Bruce was not present at Great Meadow C.F. when Plaintiff went to recreation at or after 2:30 p.m. on February 22, 2004, (3) Defendant Bruce (a correctional officer, not a correctional sergeant or lieutenant) possessed no authority to instruct a co-worker to pat-frisk Plaintiff on March 10, 2004 (or at any time), (4) Defendant Bruce's personal pat frisk of Plaintiff on March 11, 2004 would have occurred even without the improper motive alleged, and (5) Defendant Bruce would have filed a misbehavior report against Plaintiff on March 11, 2004, even without the improper motive alleged. (*Id.* at 23-24 [providing accurate citations to record evidence].) Furthermore, Plaintiff has failed to adduce evidence creating a genuine issue with regard to these facts.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's retaliation claim against Defendant Bruce.

**4. Miscellaneous Issues**

**(i) Whether Any Claims Remain**

I have carefully compared my detailed summary of the claims asserted in Plaintiff's Amended Complaint (*see, supra,* Part I.A. of this Order and Report-Recommendation) with Defendants' meritorious arguments in favor of dismissal (*see, supra,* Part II.B.3. of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

this Order and Report-Recommendation), and I report that, should the Court adopt this Report-Recommendation, all of the claims asserted in Plaintiff's Amended Complaint would be dismissed from this action. Indeed, several of those claims would be dismissed on two or more alternative grounds.

**(ii) Whether Plaintiff Should Be Afforded Another Chance to Amend**

*17 Generally, when addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN42

> FN42. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

For the sake of brevity, I will set aside the fact that one of the reasons for this rule is that the *pro se* plaintiff should be afforded special leniency due to his lack of experience with the court system and litigation process, and here Plaintiff need be afforded no such special leniency because he is experienced with the court system and litigation process (having filed at least 11 other federal or state court actions or appeals regarding his imprisonment). FN43

> FN43. *See, e.g., Pilgrim v. Keane,* 97-CV1517 (E.D.N.Y.); *Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.); *Pilgrim v. Luther,* 01-CV-8995 (S.D.N.Y.); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.); *Pilgrim v. Artus,* 07-CV-1001 (N.D.N.Y.); *Pilgrim v. Wright,* No. 03-0086 (2d Cir.); *Pilgrim v. Greene,* Index No. 505332/2003 (N.Y. Sup.Ct., Washington County); *Pilgrim v. Greene,* No. 95400 (N.Y.App.Div., 3d Dept.); *Pilgrim v. Greene,* Nos. 3-10, 526 (N.Y.); *Pilgrim v. New York,* UID 2001-005-512, Claim No. 103678 (N.Y.Ct.Cl.).

Rather, the problem with applying this leave-to-amend rule to Plaintiff under the circumstances is that granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. FN44 Here, Plaintiff has already had such a chance to amend his pleading. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.] .)

> FN44. *Cagle v. Perry,* 04-CV-1151, 2007 WL 3124806, at *6, n. 45 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Savage v. Brue,* 05-CV-0857, 2007 WL 3047110, at *5, n. 35 (N.D.N.Y. Oct.18, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3, n. 13 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Moreover, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN45 In particular, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN46 Here, the problems with Plaintiff's causes of action are substantive, not merely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

formal. Simply stated, if Plaintiff (an experienced, prolific litigant) could have alleged sufficient facts to state viable claims, he would have done so.

> FN45. *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M. J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

> FN46. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

For all of these reasons, I recommend that the dismissal of Plaintiff's Amended Complaint be *with prejudice.*

**(iii) Whether the Court Should Permit Plaintiff to Supplement the Record on Any Appeal to District Court from this Report-Recommendation**

In light of Plaintiff's prolific nature as a litigant, I anticipate that, during his likely objections to this Report-Recommendation, he will attempt to supplement the record on Defendants' Motion for Summary Judgment. I respectfully recommend that the Court, in exercising its discretion on the matter, decline to permit him to so supplement the record.

The Second Circuit recognizes that the decision of whether or not to accept such evidence as resting in the sound discretion of the district court: "Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration, and we have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's *de novo* review." *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (affirming decision by Scullin, J., of the Northern District of New York) [citations omitted].

The Fifth Circuit has *suggested* four factors that a court might consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued:

> **\*18** (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted.

> *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F.3d 847, 862 (5th Cir.2003) [citation omitted].

Here, I find that these four factors-particularly the third and fourth factors-weigh against permitting Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation. This action has been pending now since February 14, 2005, past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was passed.[FN47] Plaintiff has had a full and fair opportunity to be heard on his claims, including a full and fair opportunity to (1) conduct discovery in this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)

(Cite as: 2008 WL 2003792 (N.D.N.Y.))

matter, (2) object to any (allegedly) deficient responses to his discovery demands, and (3) respond with evidence and argument to Defendants' motion for summary judgment. For whatever reason, he chose not to do so, perhaps because he was too busy litigating other actions, or more probably because the evidence simply did not support his claims. In any event, Defendants are entitled to have their motion decided within a reasonable time frame and on a level playing field (based on evidence and arguments to which they could properly reply).

> FN47. *See Adelman v. Hobbie,* 03-CV-0032, 2006 WL 2639359, at *8 (N.D.N.Y. Sept.13, 2006) (Sharpe, J., adopting Report-Recommendation by Treece, M.J.) (dismissing *pro se* civil rights action for failure to prosecute under Rule 41[b] in part because "[o]ver three years has passed since this litigation was commenced, well past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was instituted").

For these reasons, I recommend that the Court, in exercising its discretion on the issue, deny any request by Plaintiff to supplement the record on Defendants' motion for summary judgment, during any objections to this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's cross-motion (Dkt. No. 41) is *DENIED* to the extent that it requests relief that is non-dispositive in nature (i.e., the reopening of the discovery period in this action, the adjourning of the Court's decision regarding Defendants' motion, and the imposition of sanctions against Defendants); and it is further

**RECOMMENDED** that Plaintiff's cross-motion (Dkt. No. 41) be *DENIED* to the extent that it requests relief that is dispositive in nature (i.e., the voluntarily dismissal without prejudice of Plaintiff's "defamation of character" and "[loss of] religious services" claims); and it is further

**RECOMMENDED** that Defendants' motion for

summary judgment (Dkt. No. 38) be *GRANTED,* and that all of the claims asserted in Plaintiff's Amended Complaint (Dkt. No. 9) be *DISMISSED* with prejudice; and it is further

**RECOMMENDED** that the Court *DENY* any request by Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation; and it is further

**\*19 RECOMMENDED** that the Court certify in writing, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Pilgrim v. Bruce
Not Reported in F.Supp.2d, 2008 WL 2003792 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gilberto SILVA, Plaintiff,
v.
Ray SANFORD, Lieutenant, Green Haven Correctional
Facility, et al., Defendants.
No. 91CIV.1776(AJP)(KMW).

April 24, 1998.
Kenneth R. Stephens, Michael S. Popkin.

OPINION AND ORDER

PECK, Magistrate J.

*1 Plaintiff Gilberto Silva brings this § 1983 action alleging that he was denied due process in two Tier III prison disciplinary hearings, on charges of fighting with another inmate and using a weapon, that resulted in his spending more than a year in SHU and keeplock. The first hearing, in March 1988, was administratively reversed in May 1988 because (1) the Hearing Officer, defendant Lt. Ray Sanford, was involved in the underlying incident, and (2) for unspecified "procedural errors." Fourteen days after the reversal—a delay that plaintiff Silva also claims violated his due process rights—a second hearing was held by defendant Assistant Deputy Superintendent Paul Kimmelman, who also found Silva guilty and sentenced him to 18 months in SHU and 18 months loss of certain privileges. Plaintiff Silva's SHU time was converted to keeplock time on August 15, 1988, and on May 5, 1989, he was released from keeplock. Silva therefore spent more than a year—403 days, to be exact—in SHU/keeplock as a result of the two hearings. He did not, however, lose any good time credits. At the time of the hearings, Silva had been imprisoned for four years of a 40 years to life imprisonment sentence.

The parties consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

By Opinion and Order dated August 18, 1994,

Magistrate Judge Roberts denied defendants' motion for summary judgment on qualified immunity and other grounds, and largely granted plaintiff Silva's cross-motion for summary judgment on liability. Silva v. Sanford, 91 Civ. 1776, 1994 WL 455170 (S.D.N.Y. Aug.18, 1994), familiarity with which is assumed. On appeal, the Second Circuit remanded for reconsideration in light of the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), decided after Magistrate Judge Roberts' summary judgment decision.

For the reasons set forth below, the Court holds that the 43–57 days Silva spent in SHU as a result of the Sanford hearing and the delay in commencing the rehearing, while Silva was serving a sentence of 40 years to life imprisonment, is not sufficient to create liability under Sandin v. Conner, and therefore defendants Sanford, Scully, Selsky and Coughlin are entitled to summary judgment. As to defendant Kimmelman, the Court denies summary judgment to either side, because there are material issues of fact under Sandin 's first prong as to whether 403 days in disciplinary confinement imposes an atypical and significant hardship. The Court finds, however, that if Silva prevails on both Sandin prongs, defendant Kimmelman violated Silva's due process rights (and is not entitled to qualified immunity) by not advising Silva that Kimmelman intended to rely upon the incident videotape. Nevertheless, there are factual issues for trial as to whether any such violation is "harmless error" that would limit Silva to nominal damages.

FACTS

Magistrate Judge Roberts' prior opinion sets out in detail the facts concerning Silva's disciplinary hearings, largely stipulated or obtained from the prison disciplinary hearing transcripts and records. This Opinion, therefore, only will summarize the key facts, and then set forth additional facts as to the conditions of Silva's disciplinary confinement relevant to a Sandin analysis.

*The Incident and the Sanford Hearing*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

**\*2** In March 1988, plaintiff Silva was a prisoner at Green Haven Correctional Facility, serving two consecutive sentences of twenty years to life imprisonment (*i.e.,* a total of 40 years to life) that had commenced in June 1984, for two counts of attempted murder in the first degree; in March 1998, Silva was in Green Haven's Special Housing Unit ("SHU") as a result of a prior prison incident. *See Silva v. Sanford,* 1994 WL 455170 at \*1, ¶ 2. (*See also* 11/14/95 Stipulation ["Stip."] at p. 13; 3/25/98 Letter to the Court from Asst. Atty. General Michael Popkin; 3/25/98 Letters to the Court from Kenneth Stephens, Silva's attorney.)

On March 5, 1988, plaintiff Silva was issued misbehavior reports for fighting and weapons possession, for Silva's allegedly fighting with and slashing another inmate, Allen, with a sharpened metal weapon, in the SHU yard. *Silva v. Sanford,* 1994 WL 455170 at \*2, ¶¶ 1–4. As watch commander, defendant Lt. Sanford was involved in the investigation of the incident. *Id.* at \*2, ¶¶ 6–7.

On March 17, 1988, defendant Supt. Charles Scully appointed Lt. Sanford to conduct Silva's Tier III Hearing. Supt. Scully made no attempt to determine whether Lt. Sanford was involved with the investigation of the incident that led to the charges against Silva and the Tier III hearing. *Id.* at \*3, ¶¶ 9–10. Before any evidence was received, Lt. Sanford had a telephone conversation, recorded on the hearing tape, which Magistrate Judge Roberts found clearly to show that Lt. Sanford pre-judged the case. *Id.* at \*3–4, ¶¶ 15–17, & \*12–13.

At the Sanford hearing on March 18, 1988, Silva requested " 'all tapes' concerning the incident." *Id.* at \*4, ¶ 18. Portions of the incident in the SHU yard had been recorded on videotape by closed circuit cameras roving the SHU and other areas. *Id.* at \*2, ¶ 5. "Defendant Sanford denied plaintiff's request, stating that videotapes were for the use of the Department of Correctional Services and that plaintiff could obtain them after the hearing.... Plaintiff did not request, and Sanford did not advise plaintiff that the videotapes could be reviewed by his assistant." *Id.* at \*4, ¶ 18. FN1

FN1. "At the time of the March 18, [1988] hearing it was the policy at Green Haven that

'videotapes of an incident may be viewed by the hearing officer or the inmate's assistant prior to the hearing. It is Green Haven's practice that inmates do not view the videotape. This is not a written policy. This is, however, a DOCS-wide practice .' " *Id.* at \*4, ¶ 19 (fn.omitted).

The inmates who testified at the hearing denied that there was a fight between Silva and Allen. *Id.* at \*4, ¶ 21. Nevertheless, on March 18, 1988, Lt. Sanford found Silva guilty of both charges, and imposed a penalty of two years' loss of good time credit, two years' confinement in SHU or keeplock, and two years' loss of certain privileges. *Id.* at \*4, ¶ 22. Sanford's written disposition, which was provided to Silva, indicated that Sanford relied on, *inter alia,* the incident videotape. *Id.* at \*5, ¶¶ 24–25.

Plaintiff Silva filed an administrative appeal to defendant Commissioner Thomas A. Coughlin III, which was referred to the Commissioner's designee to hear appeals from Tier III hearings, defendant Donald Selsky, Director of Special Housing Inmate Disciplinary Program. *Id.* at \*5, ¶ 26. On May 6, 1988, Selsky reversed the March 18, 1988 hearing results on the grounds that " '[r]ecords indicate that Hearing Officer [Sanford] was involved in investigation of incident in his role as Watch Commander' ... [and/or] for unspecified 'procedural error.' " *Id.* at \*5, ¶ 28. Selsky directed that a rehearing be conducted within 14 days of receipt of his memo, which Green Haven received, by mail, on May 10, 1988. *Id.* at \*5, ¶¶ 29–30.

**\*3** Silva's first claims in this case relate to the 43 days he spent in SHU as a result of the Sanford Hearing—*i.e.,* from March 29, 1988 until May 10, 1988. (Stip. at pp. 12–13.) FN2

FN2. Because Silva was in SHU on prior unrelated charges until March 28, 1988, this calculation runs from March 29, 1988 until Green Haven was informed of Selsky's reversal of the Sanford hearing on May 10, 1988.(*See* Stip. at pp. 12–13.)

**The Kimmelman Hearing**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

On May 13, 1988, defendant Supt. Scully appointed Assistant Deputy Superintendent Paul Kimmelman to conduct the rehearing. *Silva v. Sanford,* 1994 WL 455170 at *6, ¶ 32. The rehearing did not commence until May 20, 1988—fourteen days after Selsky's reversal of the prior hearing and at least ten days after Green Haven received notice that a rehearing was necessary. Plaintiff Silva claims that this delay, during which he remained in SHU, violated a DOCS' policy memorandum that rehearings must commence within seven days and be completed within 14 days. *See id.* at *6, ¶ 31.

Plaintiff Silva again chose Carlos Maldonado, a bilingual counselor at Green Haven, as his assistant for this hearing. *Id.* at *5, ¶ 30. Silva asked Maldonado to interview certain inmates before the hearing, which Maldonado did; "there is no evidence that plaintiff asked his assistant to view the Incident Videotape." *Id* . at *6, ¶ 33.

At the hearing on May 20, pursuant to plaintiff Silva's request, Kimmelman questioned four inmates, including the alleged victim, inmate Allen. All denied that there had been a fight. *Id.* at *6, ¶¶ 35–36. During an adjournment in the hearing, on May 23, 1988, "defendant Kimmelman reviewed the Incident Videotape." *Id.* at *6, ¶ 38.

When the hearing resumed on May 24, 1988, Sgt. Graham testified to an interview he had had with Allen, in which Allen told Graham that Silva had fought with and cut him. *Id.* at *7, ¶¶ 40–44. During Sgt. Graham's testimony about his interview of Allen, plaintiff Silva and his assistant asked for any tape, apparently in the context of Allen's alleged statement. As Judge Roberts described the evidence:

45. During the questioning of Graham, Maldonado stated that "Mr. Silva, he wants you to ask the Sgt. Graham, did he have any evidence, any proof or any tape of his investigation with Inmate Allen." DX–G at 45. In response to Maldonado's question, Kimmelman asked Graham if he recorded or taped his interview with Allen. Graham stated that he didn't tape or record the interview and that "[t]he only recording would be if they saved the tape from the [monitoring] office downstairs." DX–G at 46.

46. A few minutes later, Maldonado stated that "Mr. Silva wants all type of evidence against him brought to this hearing now." DX–G at 51; Pl. 3(g) ¶ 27. Kimmelman replied, "And he has to be specific." DX–G at 51–52. Kimmelman then said that he intended to interview the witness without further interruptions from the plaintiff, and plaintiff assented. A short time later, plaintiff asked if Graham had "any statement, any tape, any proof signed by Inmate *** Allen?" DX–G at 64. Kimmelman, directing his statement to Graham, said, "well, you [Graham] already testified that you did not receive a tape. Did you get Allen to make a signed statement?" Graham replied, "No." DX–G at 64. Shortly thereafter, plaintiff asked "if there are any tape[s] or any written statement(s) ***." *Id.* at 65–66. Kimmelman stated: "He's [Graham] already answered." *Id.* at 66.

*4 *Id.* at *7–8.[FN3]

FN3. Because of the importance of this evidence to the matters before me, I have read the original transcript of the Kimmelman hearing. It is clear that the requests for tapes referred unequivocally to tapes of Sgt. Graham's interview of inmate Allen, and not to the incident videotape.

After Graham's testimony, inmate Allen testified at the hearing that he and Silva did not have a fight. *Id.* at *8, ¶ 47. Silva also stated that there was no fight. *Id.* at *8, ¶ 48. Twice near the end of the hearing, Kimmelman asked Silva if he had any other evidence or testimony to present, and Silva said no. *Id.* at *8–9, ¶¶ 48, 51.

Assistant Deputy Superintendent Kimmelman found Silva guilty of both the fighting and weapons charges, based on Sgt. Graham's testimony and the Incident Videotape that showed that a fight had occurred. *Id.* at *9, ¶¶ 52–53, 56. Kimmelman sentenced Silva to 18 months in SHU and 18 months loss of certain privileges (commissary, packages, telephone calls and special events). Silva repeatedly asked Kimmelman why he had used witnesses who were not called at the first hearing, to which Kimmelman replied that he knew nothing about the prior hearing. *Id.* at *9, ¶ 55. Silva "said nothing with respect to the [incident] videotape mentioned by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

Kimmelman." *Id.* at *9, ¶ 55.

Silva filed an administrative appeal to defendant Commissioner Coughlin, complaining about the delay in commencement of the hearing. "Plaintiff's appeal does not mention or allege any violation based upon Kimmelman's reliance on the Incident Videotape." *Id.* at *10, ¶ 57. Defendant Selsky affirmed Kimmelman's disposition on July 6, 1988. *Id.* at *10, ¶ 58.

As a result, plaintiff Silva remained confined in SHU. *Id.* at *10, ¶ 59 & n. 18. On August 15, 1988, Silva's SHU time was converted to keeplock time. [FN4] *Id.* at *10, ¶ 59. On May 5, 1989, Silva was released from keeplock confinement as a result of good behavior. (Stip. at p. 13.)

> [FN4.] For discussion of the difference between SHU and keeplock confinement, *see* discussion at pages 14–15 & n. 7 below.

Thus, as a result of the Kimmelman hearing, Silva spent from May 24, 1988 to May 5, 1989, a total of 347 days, in SHU and keeplock. Counted from the Sanford hearing, Silva spent from March 29, 1988 to May 5, 1989—a total of 403 days—in SHU and keeplock.

### *Magistrate Judge Roberts' Pre–Sandin Summary Judgment Decision*

Magistrate Judge Roberts' pre-*Sandin* summary judgment decision denied defendants' summary judgment motions and largely granted Silva's cross-motion. Specifically, Magistrate Judge Roberts found that Lt. Sanford had pre-judged the evidence, and also violated Silva's rights to an impartial hearing officer. *Silva v. Sanford,* 1994 WL 455170 at *12–13 (S.D.N.Y. Aug.18, 1997).* Magistrate Judge Roberts found that Lt. Sanford was not entitled to qualified immunity, because Silva's rights to an impartial hearing officer and one who did not pre-judge the evidence was clearly established at the time of the hearing. *Id.* at *12–14. Magistrate Judge Roberts also found Supt. Scully liable, and not entitled to qualified immunity, for appointing Lt. Sanford as the hearing officer without making any attempt to determine if he had been involved in investigating the incident. *Id.* at *14.

**\*5** Magistrate Judge Roberts found that the delay in holding the second hearing violated Silva's due process

rights, and she found defendants Kimmelman, Selsky and Scully liable and not entitled to immunity. *Id.* at *15–21.

As to the Kimmelman hearing, Magistrate Judge Roberts found Assistant Deputy Superintendent Kimmelman liable, and not entitled to qualified immunity, for failing to inform Silva about the Incident Videotape and failing to provide Silva with an opportunity to comment on that evidence. *Id.* at *21–25. Magistrate Judge Roberts stated:

> I find that Kimmelman violated plaintiff's due process rights under *Sostre* and *Francis.* [FN5] Plaintiff concedes that although he knew of the videotape's existence, he never requested the videotape during the rehearing. Nevertheless, I find that Kimmelman violated plaintiff's rights by not informing him of the videotape evidence and providing him with an opportunity to comment on that evidence before a decision was rendered. Moreover, nothing in the *Sostre* and *Francis* holdings indicate that they are limited to circumstances in which an inmate specifically requests the evidence, and I refuse to read them so narrowly.

> [FN5.] *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971),* cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, & 405 U.S. 978, 92 S.Ct. 1190 (1972), and *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989).

*Silva v. Sanford,* 1994 WL 455170 at *23.* Magistrate Roberts found no personal liability as to defendant Selsky, however, since Silva did not raise the issue of Kimmelman's reliance on the Incident Videotape in his appeal to Selsky. *Id.*

### *The Second Circuit's Remand Order*

While defendants' appeal was pending in the Second Circuit, the Supreme Court issued its decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).* The Second Circuit therefore remanded Silva's case, [FN6] instructing:

> [FN6.] On Magistrate Judge Roberts' departure from the Court, this case was reassigned to me.

In *Sandin,* the [Supreme] Court stated that the plaintiff prison inmate's "discipline in segregated confinement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest."

We remand the case for further consideration, in light of the Supreme Court's intervening decision in *Sandin.* On remand, the District Court should scrutinize the nature of the liberty interest claimed by Silva. The Court should consider what weight to attach to several factors, including (but not necessarily limited to) the following factors to which the Supreme Court adverted in *Sandin:* (1) the likelihood of adverse disciplinary action resulting in loss of good time credits; *see also Wolff v. McDonnell;* (2) the extent to which the conditions of disciplinary segregation differ from other routine prison conditions; and (3) the length of time that disciplinary segregation is imposed. *Sandin.*

*Silva v. Sanford,* No. 94–2534, slip op. at 2, 62 F.3d 1412 (table) (2d Cir. July 17, 1995) (citations omitted).

On remand, the parties negotiated and entered into a stipulation regarding facts that might be relevant to the *Sandin* analysis, and briefed the *Sandin* issue.

### Facts Stipulated To By The Parties Concerning Inmate Disciplinary Hearings and SHU

**\*6** The parties stipulated to the following facts regarding inmate disciplinary hearings:
"Pursuant to the authority vested in the Commissioner, the New York State Department of Correctional Services has adopted a Three–Tier Disciplinary system." (Stip. at p. 2) The least serious disciplinary charges are considered at Tier I hearings, at which the maximum penalty that may be imposed is loss of privileges for up to 13 days and one additional work task a day. (Stip. at p. 3.) more serious violations are considered at Tier II hearings, at which the maximum penalty that may be imposed is 30 days in keeplock or SHU, loss of privileges and up to $100 restitution for lost or damaged property. (*Id.*)

The most serious violations are considered at Tier III hearings, at which the maximum penalty that may be imposed is loss of good time credits and keeplock or SHU confinement for a period of time limited only by the length

of the inmate's sentence. (Stip. at p. 4.) [FN7] There is no limit on the restitution an inmate may be required to pay, and a restricted diet may be ordered. (Stip. at p. 4.) The Tier III hearing officer must be of the rank of captain or above, although the Superintendent has the discretion to appoint other individuals. (*Id.*) At a Tier III hearing, the inmate is afforded *Wolff v. McDonnell* procedural rights, including the right to pre-hearing assistance in some cases, the right to call witnesses and a statement of the evidence relied upon. (*Id.*) The entire hearing is recorded. (*Id.*) Appeals from Tier III hearings are taken to the Commissioner, who must decide them within 60 days of receipt. (*Id.*)

> FN7. "Special Housing Units (SHUs) are provided for under the Department of Correctional Services regulations, 7 NYCRR Chapter VI, Part 300. An SHU is a group of single cells designed to maximize facility safety and security by separating and segregating the inmates housed therein from the general population." (Stip. at pp. 5–6.)

The Second Circuit has described the SHU as follows:

According to regulations promulgated by the New York Department of Correctional Services,

[a] special housing unit (SHU), in maximum security facilities as well as in designated medium security facilities, shall consist of single-occupancy cells grouped so as to provide separation from the general population, and may be used to house inmates confined to such units pursuant to Part 301 of this Title as well as such other inmates as approved by the commissioner or his designee.

[NYCRR] tit. 7, § 300.2 (1991). The regulations require SHU inmates to "be housed in an area designed to maximize facility safety and security." *Id.* § 300.1(b). Confinement in the SHU is a form of solitary imprisonment. In addition to being separated from the general

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

prison population, SHU inmates are limited in the prison issue items and personal belongings they may possess. *Id.* § 300.2. Also limited are shower and exercise privileges. *McCann v. Coughlin,* 698 F.2d 112, 117 n. 5 (2d Cir.1983).

*Walker v. Bates,* 23 F.3d 652, 655 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995); *see also, e.g., Laza v. Reish,* 84 F.3d 578, 579 (2d Cir.1996) (SHU is "a secure unit that houses inmates deemed inappropriate for housing within the general prison population"); *Frazier v. Coughlin,* 81 F.3d 313, 315 (2d Cir.1996); *Young v. Selsky,* 41 F.3d 47, 49 (2d Cir.1994), *cert. denied,* 514 U.S. 1102, 115 S.Ct. 1837, 131 L.Ed.2d 756 (1995).

The Second Circuit has described keeplock as " 'a form of administrative [or disciplinary] segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates.' " *Soto v. Walker,* 44 F.3d 169, 171 (2d Cir.1995) (quoting *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing NYCRR tit. 7, § 251–1.6)); *see also, e.g., Wright v. Coughlin,* 132 F.3d 133, 135 (2d Cir.1998) ("Keeplock is a form of administrative segregation in which an inmate is confined to his cell and denied participation in normal prison activities, as well as telephone and commissary privileges"); *Green v. Bauvi,* 46 F.3d 189, 191 (2d Cir.1995) ("Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities; it is also used as an administrative confinement for prehearing housing of inmates facing disciplinary hearings.").

For purposes of this action, the parties have not distinguished between the SHU and keeplock confinement conditions to which Silva was subjected, and therefore neither will

this Opinion.

The parties did not develop statistical information about disciplinary hearings and SHU confinements in 1988, when Silva was disciplined and confined. Instead, the parties used later information as a rough proxy for 1988 data. According to DOCS' statistics, for the period January 1 through May, 1995, there were a total of 75,641 hearings: 26,469 (35%) were Tier I hearings, 35,941 (48%) were Tier II hearings, and 11,484 (15%) were Tier III hearings. (Stip. at p. 5.) Based on a "snapshot" analysis by DOCS, on October 9, 1995, of the 1,761 inmates serving punitive SHU sentences at that time, approximately 23%, (399) were serving sentences of 2 years or more, and 36% (632) were serving sentences of 1–2 years. (*Id.*) In other words, based on the "snapshot" analysis, almost 60% of the prisoners in SHU were serving SHU sentences of one year or more.[FN8]

FN8. Certain 1993 statistics, as analyzed by Silva's counsel, reveal a different story. In 1993, of 15,568 disciplinary charges resulting in some level of SHU, keeplock or cube confinement, only 130, or less than one percent, resulted in confinement of one year or more. Just looking at those prisoners sentenced to SHU in 1993, of 1,031 such punishments, only 122, or 12%, resulted in SHU confinement of one year or more. (Stephens Aff. ¶¶ 5–8 & Ex. 3.) *See also, e.g., Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997) ("There were 61,736 inmates under DOCS custody on January 1, 1993 and 64,569 inmates under custody on January 1, 1994. In 1994, there were 25,661 Tier III disciplinary hearings, which resulted in 6,247 SHU penalties and 13,060 keeplock penalties. In contrast, in 1993, there were 5,892 SHU penalties and 11,974 keeplock penalties from Tier III hearings; for 1995, the figures are 6,065 SHU penalties and 14,987 keeplock penalties. The high number of Tier III hearings and SHU or keeplock penalties attests to the fact that in New York, SHU confinement is 'a normal aspect of the range of conditions experienced by inmates as part of their state sentence of imprisonment.' ") (fact citations

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

omitted); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *3 n. 2 (S.D.N.Y. Aug.22, 1996) ("In contrast, in 1988, there were 44, 560 prisoners [under DOCS custody] and 13,806 Tier III hearings.")

The following are some of the restrictions imposed on SHU inmates: [FN9] (1) out of cell recreation is limited to 1 hour daily; (2) limited amounts of material may be requested from the law library but SHU inmates may not visit the library, and legal assistants are not allowed access to SHU; (3) one non-legal visit is allowed per week; (4) participation in congregate religious services is not allowed but access to individual religious counseling is allowed; (5) phone calls may not be made without the permission of the Superintendent and then only for emergency or legal purposes, and (6) packages may not be received other than books, periodicals and legal material. (Stip. at p. 6.)

> FN9. While the parties' stipulation cited the relevant NYCRR sections containing the SHU restrictions, the parties did not clearly state when the regulations were in place—in 1988 when Silva was sent to SHU, or in 1995 when the Stipulation was submitted. This information is essential in light of the Second Circuit's recent decision in *Scott v. Albury,* Docket No. 96–2943, 1049, 1998 WL 100549 at *5 (2d Cir. March 9, 1998) ("Because the alleged deprivation of due process occurred in 1987, the district court should have looked to the regulations as they were then.").

**\*7** Specifically, the following practices distinguished SHU imprisonment at Green Haven at the time Silva was housed in SHU from general population imprisonment: SHU inmates were allowed one hour of outdoor exercise in a small enclosed yard without any recreational equipment, and exercised in groups of four. General population inmates had a choice of several large yards with weight lifting and sports equipment, and hundreds of inmates could be in any yard at one time. (Stip. at pp. 6–7.) General population inmates also had access to television. (Stip. at p. 7.)

SHU inmates were limited to in-cell study programs, whereas general population inmates had an opportunity to participate in various educational and rehabilitative programs. (*Id.*) General population inmates were usually assigned two program modules a day including either an academic program or a job assignment which paid some form of wages. (*Id.*)

SHU inmates had to eat their meals alone in their cells, whereas general population inmates ate their meals in the cafeteria with other inmates. (*Id.*) General population inmates also could attend weekly group religious services, and were permitted to have visitors every day. (*Id.*) SHU inmates could not participate in congregate religious services and were limited to one non-legal visit per week. (Stip. at p. 6.)

General population inmates therefore could wind-up spending most of their time out of their cells. (Stip. at p. 7.)

### *Other Sandin–Related Facts*

In March, 1998, when Silva's disciplinary hearings were held, Silva was serving two consecutive 20 years to life sentences—*i.e.,* a total of 40 years to life—for two counts of attempted murder in the first degree. (3/25/98 Letters to Court from Kenneth Stephens & Michael Popkin.) The two disciplinary hearings resulted in 403 days in SHU/keeplock during a 40 year to life prison sentence. (*See* page 10 above.)

Silva's affidavit stated that those 403 days he spent in SHU/keeplock were "very bad, much worse than [in] general population":

> 6. Life in the box [*i.e.,* SHU] in Green Haven was very bad, much worse than general population. In the box you only get to go out once a day for an hour. I spent a lot of time just looking at the ceiling. It is very hard to communicate in the box, especially if you are Spanish speaking [which Silva is]. They had some magazines and things to read but they were in English.

> 7. The guards in the box are much more aggressive than the ones in general population. They treat you much worse, with no respect.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

8. Being in the box made me feel very bad. I did not ask to see a counselor though because I was afraid they would put me on some medication and say that I had mental problems.

....

12. Right after the second hearing I was sent to Clinton. They kept me in a cell with plexiglass for three days. Then I was in the box in Clinton until August. This was like being in the box in Green Haven except now I was even further from my family.

**\*8** 13. After a few months in the box at Clinton I was put on keeplock. In keeplock you are not in the box but you are still locked up all day, except for about one hour. You cannot go to programs or a job and you cannot communicate with people the way you can if you are free in general population.

14. I cannot understand how anyone could say that being in the box or on keeplock is the same as being in general population. It was much, much worse.

(Silva Aff. ¶¶ 6–8, 12–14.)

Silva also submitted an expert affidavit from Dr. Stuart Grassian, a psychiatrist, on the psychological effects of solitary confinement. Dr. Grassian opined that long periods on SHU can cause mental illness:

In my opinion, solitary confinement can cause severe psychiatric harm, in the form of a specific syndrome that has been reported by many clinicians in a variety of settings. This harm is more likely to occur, and is likely to become more severe, as the conditions of confinement are made increasingly stringent, and as the length of confinement becomes more prolonged.... Many inmates have become seriously ill as a result of prolonged incarceration in solitary, some even suffering periods of psychotic disorganization. For some, SHU confinement has severely exacerbated a previously existing mental conditions (sic), in some cases quite dramatically; for others, SHU confinement caused a mental illness where none had been observed before. Many inmates, indeed, became acutely psychotic as a

result of such incarceration.

....

I conclude to a reasonable degree of medical certainty that there is a very substantial likelihood that an inmate sentenced to two years confinement in the type of conditions to which Mr. Silva was sentenced in March 1988, would suffer severe psychiatric harm as a result of such prolonged incarceration under such stringent conditions. Given this fact, I conclude to a reasonable degree of medical certainty that such confinement represents, from a psychiatric viewpoint, a severe and dramatic departure from general prison conditions prevailing in New York State prisons.

(Grassian Aff. at pp. 3–4.)

## ANALYSIS

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988); *Williams v. Keane,* 95 Civ. 0379, 1997 WL 527677 at *3 (S.D.N.Y. Aug.25, 1997) (Peck, M.J.). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994); *accord, e.g., Williams v. Keane,* 1997 WL 527677 at *3; *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95–CV–975, 1996 WL 732559 at *3 (N.D.N.Y. Dec.11, 1996); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990); *accord, e.g., Williams v. Keane,* 1997 WL 527677 at *3; *Ruiz v. Selsky,* 1997 WL 137448 at *4; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1104.[FN10]

FN10. For a discussion of the applicable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

standards governing summary judgment motions, *see, e.g., Meritxell, Ltd. v. Saliva Diagnostic Sys., Inc.,* 96 Civ. 2759, 1998 WL 40148 at *4–5 (S.D.N.Y. Feb.2, 1998), and *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997)* (Peck, M.J.), and cases cited therein.

**I. THE SUPREME COURT'S DECISIONS IN SANDIN V. CONNER AND EDWARDS V. BALISOK**

**A. Sandin v. Conner**

**\*9** The Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995),* significantly changed the prisoner due process landscape.[FN11] The Supreme Court there held:

> FN11. The Second Circuit has clearly instructed that the "standard articulated in *Sandin* applies retroactively to govern [a court's] review of [prisoner's] claims" for pre-*Sandin* occurrences. *See, e.g., Arce v. Walker,* Docket No. 96–2012, 1998 WL 119612 at *4 (2d Cir. March 18, 1998).

[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 483–84, 115 S.Ct. at 2300 (fns. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language

and for harassing employees. *Id.* at 475–76, 115 S.Ct. at 2295–96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in SHU. *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Sandin v. Conner,* 515 U.S. at 487, 115 S.Ct. at 2302. The Supreme Court stated:

> We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa (prison) involve significant amounts of "lockdown time" even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.

> *Id.* at 486, 115 S.Ct. at 2301 (fns. omitted & emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

**\*10** To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *accord, e.g., Arce v. Walker,* Docket No. 96–2012, 1998 WL 119612 at *3 (2d Cir. March 18, 1998); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998); *Williams v. Keane,* 95 Civ. 0379, 1997 WL 527677 at *4 (S.D.N.Y. Aug.25, 1997) (Peck, M.J.); *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *5 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at *3 (S.D.N.Y. Aug.14, 1996).

A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556–58, 94 S.Ct. at 2974–75, and its progeny. *See, e.g., Foxworth v. Selsky,* No. 95–CV–1168, 1998 WL 59448 at *2, 4 (N.D.N.Y. Feb.9, 1998); *Charles v. Coughlin,* 985 F.Supp. 88, 93 (E.D.N.Y.1997); *Nicholas v. Remillard,* No. 92–CV–900, 1997 WL 711385 at *5 (N.D.N.Y. Nov.13, 1997); *Williams v. Keane,* 1997 WL 527677 at *4; *Ruiz v. Selsky,* 1997 WL 137448 at *5; *Pacheco v. Vanwyk,* No. 94–CV–456, 1997 WL 642540 at *8 (N.D.N.Y. Oct.15, 1997); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n. 4 (S.D.N.Y. Nov.6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n. 1.

**B.** *Edwards v. Balisok and Its Interpretation*

In May 1997, two years after its *Sandin* decision, the Supreme Court decided *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). *Edwards* involved a prisoner § 1983 action seeking damages for alleged due process violations during a prison disciplinary proceeding that resulted in a punishment of disciplinary segregation and loss of good time credits. 520 U.S. at —––, 117 S.Ct. at 1587. Without ever mentioning *Sandin,* the Supreme Court held that a § 1983 damage claim would not lie because it necessarily implied the invalidity of the prisoner's punishment which had not yet been set aside.

The Supreme Court's opinion in *Edwards* began with a discussion of the Supreme Court's prior *Heck v. Humphrey* decision:

In *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 2372–73, 129 L.Ed.2d 383 (1994), this Court held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if "a judgment in

favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated. This case presents the question whether a claim for damages and declaratory relief brought by a state prisoner challenging the validity of the procedures used to deprive him of good time credits is cognizable under § 1983.

**\*11** *Edwards v. Balisok,* 520 U.S. at —––, 117 S.Ct. at 1586.

*Heck,* which *Edwards* relied upon, was a § 1983 claim for due process violations during a state criminal prosecution, a suit that the Supreme Court analogized to a malicious prosecution action. In *Heck,* the Supreme Court held:

We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, *a § 1983 plaintiff must prove that the conviction or sentence has been reversed* on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, *when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.* But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Heck v. Humphrey,* 512 U.S. at 486–87, 114 S.Ct. at 2372–73 (fns. omitted & emphasis added).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

*Edwards* applied *Heck* to a prisoner's challenge to the prison disciplinary proceeding that resulted in a deprivation of good time credits: "We conclude, therefore, that [the plaintiff inmate's] claim for declaratory relief and money damages, based on allegations of deceit and bias on the part of the (prison) decisionmaker that necessarily imply the invalidity of the punishment imposed, is not cognizable under § 1983." *Edwards v. Balisok,* 520 U.S. at ———, 117 S.Ct. at 1589.

There is a Circuit split as to *Edward's* effect on § 1983 due process claims concerning prison disciplinary proceedings that result in SHU/keeplock punishment but no loss of good time credits.

In *Stone–Bey v. Barnes,* 120 F.3d 718 (7th Cir.1997), the Seventh Circuit dismissed a § 1983 claim seeking damages for a prison disciplinary punishment of disciplinary segregation without loss of good time credit, citing *Heck v. Humphrey and Edwards v. Balisok.* *Stone–Bey v. Barnes,* 120 F.3d at 719, 721–22. The Seventh Circuit explained:

*Does it make any difference in applying Heck that the sentence imposed was one of disciplinary segregation alone, as opposed to segregation coupled with a loss of good-time credits? ... In our view, it does not.* The Supreme Court was concerned in *Heck* not only with the particular sentence imposed, but also with the fact of the prisoner's conviction itself.... *The "conviction" in the prison disciplinary sense is the finding of guilt on the disciplinary charge, and if success on the plaintiff's* section 1983 *claim necessarily would imply the invalidity of that finding, then Heck bars the claim until such time as its requirements are satisfied ....* It is clear as well that those requirements can be met even where the sentence imposed is only one of disciplinary segregation. In this case, for example, (plaintiff) could have satisfied *Heck* by pursuing his administrative appeals within the state system ..., or by filing a petition for a writ of habeas corpus in federal district court.... Given that we find the instant prison disciplinary "judgment" to be within the scope of *Heck.*

**\*12** *Stone–Bey v. Barnes,* 120 F.3d at 721 (emphasis added).[FN12]

FN12. *See also* *Stewart v. Smith,* 124 F.3d 205 (table), 1997 WL 527747 at *1–2 (7th Cir. Aug.22, 1997)* (*Heck* and *Edwards* bar prisoner's segregation and transfer claims, even where no loss of good time credit).

In contrast, the D.C. Circuit has limited *Edwards* to prison disciplinary cases involving a loss of good time credits:

We conclude, however, that [plaintiff's] suit, which challenges only his placement in administrative segregation, is not of the type to which it is appropriate to apply *Preiser* and its progeny. *The [Supreme] Court has never deviated from Preiser's clear line between challenges to the fact or length of custody and challenges to the conditions of confinement.* In *Edwards,* the Court was careful to respect the distinction drawn by *Preiser,* repeatedly characterizing the plaintiff's claim as one that would "necessarily imply the invalidity of his good time credits" and therefore hasten his release. *Heck,* too, observed that the damages action in that case was in effect an attack on ' 'the fact or length of confinement.' ' The Court also did not question the plaintiff's invocation of section 1983 in *Sandin,* a case in which the underlying prison disciplinary proceeding affected only the plaintiff's conditions of confinement, not the duration of his sentence.

*Brown v. Plaut,* 131 F.3d 163, 167–68 (D.C.Cir.1997) (citations & fns. omitted, emphasis added).[FN13] The D.C. Circuit explicitly rejected the seventh Circuit's contrary view:

FN13. *See also* *Neal v. Shimoda,* 131 F.3d 818, 823–24 (9th Cir.1997) (permits inmate § 1983 claim challenging state Sex Offender Treatment Program that affects their eligibility for parole, because if inmates win, "it will in no way guarantee parole or necessarily shorten their prison sentences by a single day.... Because the inmates' challenge in this case does not necessarily imply the invalidity of their convictions or continuing confinement, it is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

properly brought under § 1983.").

We recognize that one court of appeals has applied *Edwards* to a case in which the prisoner was subject only to disciplinary segregation, and not to loss of good time or any other change in the length of confinement. *See* Stone–Bey v. Barnes, 120 F.3d 718, 721 (7th Cir.1997). We have found no other court of appeals decisions reaching this conclusion, and for the reasons set out in the text, we do not find its reasoning persuasive.

Brown v. Plaut, 131 F.3d at 168 n. 5.

Several Southern District decisions have utilized *Edwards* to dismiss prisoner § 1983 due process claims challenging disciplinary confinement without loss of good time credits. For example, in Shabazz v. Pico, 93 Civ. 1424, 1998 WL 65987 (S.D.N.Y. Feb.18, 1998), where the prisoner's § 1983 suit challenged a prison disciplinary hearing that resulted in 90 days in SHU and 90 days loss of privileges (but no lose of good time credits), Judge Sotomayor dismissed under *Edwards:*

> In *Edwards v. Balisok,* the Supreme Court held that a "claim for damages and declaratory relief brought by a state prisoner challenging the validity of the procedures" is not cognizable under 42 U.S.C. § 1983 "where the allegations of due process violations, if true, would 'necessarily imply the invalidity of the punishment imposed' unless the prisoner establishes that the determination at issue has previously been invalidated." "[T]he Supreme Court is sending a loud message: an inmate cannot seek money damages for alleged deprivations arising out of a prison disciplinary hearing by commencing an action under § 1983 unless the results of that hearing already have been invalidated." As in *Edwards,* the plaintiff here is challenging the impartiality and bias of the hearing officers. Because plaintiff is allegations necessarily imply the invalidity of the dispositions of these two disciplinary hearings, plaintiff's claims under § 1983 are precluded by *Edwards.*

**\*13** Shabazz v. Pico, 1998 WL 65987 at \*9 (citations omitted); *see also* Jenkins v. Haubert, 95 Civ. 5453, 1998 WL 148332 at \*2–3 (S.D.N.Y. March 30, 1998)

(Mukasey, D.J.); Odom v. Coombe, 95 Civ. 6378, 1998 WL 120361 at \*3 (S.D.N.Y. March 18, 1998) (Chin, D.J.); Burnell v. Coughlin, 975 F.Supp. 473, 477–79 (W.D.N.Y.1997); Scott v. Scully, 93 Civ. 539951 at \*2 (S.D.N.Y. Aug. 28, 1997) (Baer, D.J.); Sims v. Artuz, 96 Civ. 0216, 1997 WL 527882 at \*11 (S.D.N.Y. Aug.25, 1997) (Preska, D.J.); Higgins v. Coombe, 95 Civ. 8696, 1997 WL 328623 at \*9–10 (S.D.N.Y. June 16, 1997) (Sotomayor, D.J.).

On the other hand, in dicta in Brodie v. Kuhlman, 96 Civ. 0328, 1997 WL 411932 at \*1–2 (S.D.N.Y. July 23, 1997), Judge Baer indicated that a challenge to disciplinary confinement without loss of good time credits can be raised in a § 1983 action, explaining that "[b]ecause confinement to SHU goes to the conditions of confinement, as opposed to the 'fact or duration' of confinement, § 1983 appears to be an appropriate vehicle with an appropriate remedy ." Brodie v. Kuhlman, 1997 WL 411932 at \*1 (citation omitted).

The Second Circuit has not directly addressed *Edwards'* application to § 1983 claims about prison disciplinary proceedings that result in disciplinary confinement but not loss of good time credits. After *Edwards,* however, the Second Circuit has decided a number of § 1983 disciplinary confinement due process cases on *Sandin* grounds without any discussion or even mention of *Edwards. See, e.g.,* Arce v. Walker, Docket No. 96–2012, 1998 WL 119612 (2d Cir. March 18, 1998); Scott v. Albury, Docket No. 96–2943, 1049, 1998 WL 100549 (2d Cir. March 9, 1998); Wright v. Coughlin, 132 F.3d 133 (2d Cir.1998); Sealey v. Giltner, 116 F.3d 47 (2d Cir.1997). Moreover, there are scores of post-*Edwards* district court decisions from within the Second Circuit that analyze § 1983 prison disciplinary confinement cases under *Sandin* without addressing *Edwards.* (*See* cases cited at pages 36–39 & n. 16 below.)

This Court agrees with the D.C. Circuit's *Brown v. Plaut* opinion. A prisoner § 1983 case seeking damages for disciplinary confinement without loss of good time credits should be viewed as a condition of confinement case and therefore should be analyzed under *Sandin;* such a case does not affect the duration of confinement and thus does not need to be examined under *Heck* and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

*Edwards.*[FN14] Moreover, if *Edwards* were applicable to disciplinary confinement without good time loss cases, the Supreme Court would have said so in *Sandin* (it could have decided *Sandin* using a *Heck–Edwards* analysis without going into the atypical and significant hardship standard) or at least in *Edwards* . The Supreme Court's decision of *Edwards* shortly after *Sandin* is an indication that *Edwards* applies only in loss of good time credit cases and not where the only punishment is disciplinary confinement. This conclusion also is implicitly recognized in the recent Second Circuit disciplinary confinement decisions employing a *Sandin* analysis, without mention of *Edwards.*

> FN14. Of course, if the prison disciplinary hearing results in both a loss of good time credits and SHU confinement, *Edwards* applies.

## II. POST–SANDIN DECISIONS IN THIS CIRCUIT

*14 The post-*Sandin* decisions from the Second Circuit and District Courts within the Circuit have shed some additional light on *Sandin's* application.

### A. The Sandin Analysis Turns on the Punishment Actually Imposed and Served

First, the Second Circuit's recent *Sandin* pronouncement makes clear that it is the punishment actually imposed, and not the potential punishment that could have been imposed in the Tier III hearing, that controls the *Sandin* analysis. See *Scott v. Albury,* Docket No. 96–2943, 1049, 1998 WL 100549 at *3–5 (2d Cir. March 9, 1998).* “This focus on actual punishment is consistent with the general thrust of *Sandin, i.e.,* limiting federal due process supervision to conditions that represent atypical and significant hardship.” *Id.* at *3. In response to the argument that this is unworkable because prison officials would not known in advance whether procedural requirements apply, the Second Circuit responded:

> Maybe but one assumes that states will take the precaution of providing the required level of due process to every inmate who realistically faces a punishment that is atypical under Sandin, a precaution that would render the actual punishment rule perfectly workable.

*Id.* at *5. The Second Circuit therefore held that in conducting the *Sandin* analysis, “courts should consider the degree and duration of the sentence actually imposed in the hearing and not the maximum sentence that might have been imposed.” *Id.*

Indeed, the Court should look at the punishment actually imposed and served where DOCS has corrected its own mistakes by reversing or shortening a Tier III punishment. As this Court previously held:

> [L]ooking at the punishment actually served encourages DOCS to correct its own mistakes. As Judge Edelstein stated, “[t]his Court is unwilling to find that a cause of action arises from a prison's self-correction,” where “the prisons' disciplinary systems worked effectively to correct themselves before any harm could come to the inmates.” *Cespedes v. Coughlin,* [956 F.Supp. 454, 474, vacated, 969 F.Supp. 254 (S.D.N.Y.1997)* ].

> [L]ooking at the punishment actually given and served will not cause confusion for prison disciplinary authorities. Because every Tier III hearing might result in a loss of good time credit (which appears to trigger a *Sandin* liberty interest), DOCS should provide basic *Wolff* -type due process in connection with all Tier III hearings. If, however, the punishment actually given the inmate (at the Tier III hearing or as a result of prison administrative review) does not involve loss of good time credit and does not exceed one year (or wherever the courts ultimately draw that line), then no liberty interest is implicated, and no federal due process claim will lie. In essence, this is a “harmless error” type analysis, or as Judge Edelstein more colorfully expressed it, this is “a ‘no harm-no foul’ approach.” *Cespedes v. Coughlin,* [956 F.Supp. at 473].*

*15 *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *7 (S.D.N.Y. March 24, 1997)* (Peck, M.J.); *see also, e.g., Husbands v. McClellan,* No. 93–CV–6025, 1998 WL 24232 at *2 (W.D.N.Y. Jan.13, 1998); *Warren v. Irvin,* 985 F.Supp. 350, 354 (W.D.N.Y.1997); *Beaman v. Coombe,* 96 Civ. 3622, 1997 WL 538833 at *4 n. 3 (S.D.N.Y. Aug.29, 1997).*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

**B. *Duration of the Punishment is a Key Factor, and it Now Appears that Punishment of Less Than a Year in SHU or Keeplock is Not An Atypical and Significant Hardship Under Sandin***

The Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

> The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest.

*Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *see, e.g., Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Seale v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) (noting the "desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement"); *Brooks v. DiFasi,* 112 F.3d 46 (2d Cir.1997); *Williams v. Keane,* 95 Civ. 0379, 1997 WL 527677 at *5–6 (S.D.N.Y. Aug.25, 1997) (Peck, M.J.); *Wright v. Miller,* 973 F.Supp. 390, 394 (S.D.N.Y.1997) ("district courts are required to make factual findings with respect to the conditions of confinement at issue in each case").[FN15]

> FN15. *See also, e.g., Hynes v. Riccoboni,* No. 95–CV–901, 1998 WL 106236 at *2 (N.D.N.Y. March 3, 1998); *Husbands v. McClellan,* No. 93–CV–6025, 1998 WL 24232 at *2 (W.D.N.Y. Jan.13, 1998); *Warren v. Irvin,* 985 F.Supp. 350, 353 (W.D.N.Y.1997); *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997); *Hailey v. Provost,* No. 94–CV–1616, 1997 WL 627547 at *6 (N.D.N.Y. Oct.9, 1997); *Hamilton v. Poole,* No. 95–CV–239, 1997 WL 626406 at *4 (W.D.N.Y. Sept.22, 1997); *Boddie v. Brunelle,* No. 95–CV–748, 1997 WL 626407 at *7 (W.D.N.Y. Sept.19, 1997).

The factors a district court should consider in determining whether plaintiff has suffered "atypical and significant" hardship under *Sandin* include:

> (1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

*Wright v. Coughlin,* 132 F.3d at 136; *see also, e.g., Foxworth v. Selsky,* No. 98–CV–1168, 1998 WL 59448 at *1 n. 2 (N.D.N.Y. Feb.9, 1998).

Duration is one of the most important factors in that analysis. *See, e.g., Arce v. Walker,* Docket No. 96–2012, 1998 WL 119612 at *6 (2d Cir. March 18, 1998); *Scott v. Albury,* Docket No. 96–2943, 1049, 1998 WL 100549 at *4 (2d Cir. March 9, 1998); *Wright v. Coughlin,* 132 F.2d at 136–37; *Brooks v. DiFasi,* 112 F.3d at 48–49; *Husbands v. McClellan,* 990 F.Supp. 214, 1998 WL 24232 at *2; *Warren v. Irvin,* 985 F.Supp. at 353; *Kingwood v. Coombe,* 96 Civ. 0432, 1997 WL 323913 at *4 (S.D.N.Y. June 13, 1997); *Zaire v. Mitchell,* No. 95–CV–1172, 1997 WL 176309 at *3 (N.D.N.Y. April 10, 1997) ("Most courts look to the actual length of the sentence imposed in the disciplinary hearing to determine whether a liberty interest exists."), *aff'd,* 131 F.3d 132 (2d Cir.1997); *Cespedes v. Coughlin,* 956 F.Supp. 454, 472 (S.D.N.Y.) ("The case law suggests that it is the length of SHU confinement which is the crucial consideration, particularly where the inmate has alleged no particular hardship other than the term of confinement itself."), *vacated,* 969 F.Supp. 254 (S.D.N.Y.1997); *see also* cases cited below.

**\*16** The Second Circuit, however, has not yet stated a bright line rule that any particular duration does, or does not, constitute an atypical and significant hardship. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Lee v. Coughlin,* 93 Civ. 8952, 1997 WL 193179 at *3 (S.D.N.Y. April 18, 1997) ("The Second Circuit has not yet prescribed a bright line rule ... on what length of confinement constitutes an atypical and significant hardship."). There have been numerous post-*Sandin* decisions by the District Courts in this Circuit, however, and while the decisions are not unanimous, "the precedent

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

established by these district courts unequivocally demonstrates their virtual refusal to find an atypical and significant hardship arising from a prisoner's confinement, even where the term of confinement is substantial." *Cespedes v. Coughlin,* 956 F.Supp. at 470–71 (citing cases); *accord,* e.g., *Williams v. Keane,* 1997 WL 527677 at *8; *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *5 (S.D.N.Y. March 24, 1997)* (Peck, M.J .). Indeed, Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to *Sandin* ] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin.* Indeed, *it now appears that any period of segregation of one year or less affords no protected liberty interest."* *Polanco v. Allan,* No. 93–CV–1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996)* (emphasis added) (365 days in SHU upheld), *reaffirmed on reconsideration,* 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996)* ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence"); *accord,* e.g., *Tellier v. Scott,* 94 Civ. 3459, 1998 WL 65983 at *4 n. 12 (S.D.N.Y. Feb.18, 1998)* (noting that "[a] number of district courts have dismissed claims where the duration of segregated confinement was one year or less); *Williams v. Keane,* 1997 WL 527677 at *8* (citing cases); *Dawes v. Dibiase,* No. 91–CV–479, 1997 WL 376043 at *5–6 (N.D.N.Y. July 3, 1997)* ("A review of numerous post-*Sandin* decisions throughout the Second Circuit reveals a trend illustrating the proposition that confinement in SHU of up to one year does not implicate a liberty interest under *Sandin* .... In light of the above referenced body of post-*Sandin* caselaw, this Court will not hold that confinement in SHU of six, twelve and two months, respectively, imposes an 'atypical and significant hardship' on plaintiff.") (citing cases); *Ruiz v. Selsky,* 1997 WL 137448 at *5; *Marino v.. Klages,* 973 F.Supp. 275, 278 (N.D.N.Y.1997)* ("district courts in the Second Circuit have generally found that any SHU confinement under a year in time is not an atypical or significant hardship on the prisoner."); *Duamutef v. O'Keefe,* No. 6:94–CV–0470, 1996 WL 673125 at *8 (N.D.N.Y. March 14, 1996)* ("Increasingly ... courts in this and other districts have found longer and longer periods of segregated housing not to be an 'atypical and significant

hardship' to the point where it now appears that any period of segregation under one year affords no protected liberty interest.").

*17 The decisions in this Circuit bear out Chief Judge McAvoy's conclusion. *See,* e.g., *Williams v. Keane,* 1997 WL 527677 at 6–8 & n. 4 (citing cases); *Ruiz v. Selsky,* 1997 WL 137448 at *5 & n. 5 (citing cases); *Hynes v. Riccoboni,* 1998 WL 106236 at *3 ("30 day confinement by itself is insufficient to implicate a protected liberty interest] given that '[a] review of numerous post-*Sandin* decisions throughout the Second Circuit reveals a trend illustrating the proposition that confinement ... of up to one year does not implicate a liberty interest under *Sandin* ' ").[FN16]

FN16. *Williams* and *Ruiz* collected virtually all of the then decided *Sandin* cases within the Circuit. For subsequent *Sandin* decisions, *see* *Arce v. Walker,* 1998 WL 119612 at *7 (affirming that 18 days in SHU is not atypical); *McIntosh v. Daddario,* 94 Civ. 6709, 1998 WL 118156 at *4 (S.D.N.Y. March 17, 1998)* ("keeplock confinement for 45 days is not sufficient to meet the liberty interest standard as enunciated in Sandin"); *Smalls v.. Keane,* 95 Civ. 0184, 1998 WL 108010 at *2 (S.D.N.Y. March 12, 1998)* ("plaintiff's five day confinement in keeplock clearly does not constitute 'an atypical and significant hardship' implicating a protected liberty interest"); *Jackson v. New York Dep't of Correctional Servs.,* 94 Civ. 8731, 1998 WL 59060 at *3 (S.D.N.Y. Feb.11, 1998)* ("Plaintiff's confinement in keeplock for 13 days, does not amount to an atypical and significant hardship under *Sandin* as a matter of law."); *Husbands v. McClellan,* 990 F.Supp. 214, 1998 WL 24232 at *3–4 (180 days in SHU); *Warren v. Irvin,* 985 F.Supp. at 354–56 (161 days in SHU during 6 to 12 year prison sentence); *Nicholas v. Remillard,* No. 92–CV–900, 1997 WL 711385 at *5 (N.D.N.Y. Nov.13, 1997)* (25 days in keeplock); *Thomas v. Irvin,* 981 F.Supp. at 799–800 (7 days in drug watch isolation; *Carpio v. Walker,* No. CIV.A.95CV1502, 1997 WL 642543 at *6 (N.D.N.Y. Oct.15, 1997)* (potential 30 days SHU

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

or keeplock, and actual 5 days in keeplock); *Hamilton v. Poole,* 1997 WL 626406 at *5–6 (60 days in keeplock); *Boddie v. Brunelle,* 1997 WL 626407 at *7–8 (55 hours in SHU pending disciplinary hearing); *Beaman v. Coombe,* 96 Civ. 3622, 1997 WL 538833 at *4 (S.D.N.Y. Aug.29, 1997) (92 days in SHU); *Gill v. Pact Org.,* 95 Civ. 4510, 1997 WL 539948 at *6–7 (S.D.N.Y. Aug.28, 1997) (18 days in administrative lock-up).

### III. *APPLICATION TO THE SANFORD HEARING AND THE DELAY BEFORE THE RE–HEARING*

Lt. Sanford imposed two years' loss of good time credit, two years' SHU or keeplock and two years loss of privileges. See *Silva v. Sanford,* 91 Civ. 1776, 1994 WL 455170 at *4, 22 (S.D.N.Y. Aug.18, 1994). However, because defendant Selsky reversed the Sanford hearing, Silva only served 43 days in SHU as a result of that hearing. (*See* page 6 & n. 2 above.) Even if the additional 14 days before the start of the Kimmelman hearing is added to that, Silva would only have spent 57 days in SHU as a result of the administratively-reversed Sanford hearing.

Because the Sanford hearing, including its loss of good time credits ruling, was administratively reversed, *Edwards v. Balisok* does not bar this portion of Silva's § 1983 action, no matter how *Edwards* is interpreted. *See, e.g., Warren v. Irvin,* 985 F.Supp. at 350, 353 & n. 3 (W.D.N.Y.1997).

As discussed above, it is this Court's opinion that the *Sandin* analysis should look not at the potential penalty, but at the penalty which was actually imposed (as the Second Circuit held in *Scott v. Albury* ) *and* actually served before administrative reversal or modification. *Ruiz v. Selsky,* 95 Civ.2003, 1997 WL 137448 at *6–7 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *see* pages 32–34 above.

In this case, Silva only served 43–57 days in SHU as a result of the Sanford hearing. Absent extraordinary circumstances, the cases unanimously hold that punishment of less than 60 days in SHU or keeplock does not constitute an atypical and significant hardship under *Sandin. See, e.g., Williams v. Keane,* 95 Civ. 0379, 1997 WL 527677 at *6–8 (S.D.N.Y. Aug.25, 1997) (Peck, M.J.) (and cases cited therein); *Ruiz v. Selsky,* 1997 WL 137448 at *5–6 & n. 5 (and cases cited therein).[FN17]

> **FN17.** For the same reason, the short, 14–day delay between Selsky's reversal of the Sanford hearing and the commencement of the Kimmelman hearing does not constitute an atypical and significant hardship under *Sandin.*

The Court does not believe it appropriate, in analyzing defendants' liability for the Sanford hearing, to consider the additional time Silva spent in SHU or keeplock as a result of the Kimmelman hearing. The issue here is not injunctive relief but damages. In determining § 1983 liability, the Court must look separately at each defendant's actions.[FN18] It is undisputed that Lt. Sanford had no involvement in the second (*i.e.,* Kimmelman) hearing. Sanford's liability, therefore, should not depend on whether Kimmelman—without any involvement from Sanford—separately violated Silva's due process rights in the second hearing.[FN19] If the Kimmelman hearing had not occurred or had satisfied due process requirements, Sanford would not be liable, and in this Court's view he should not be liable simply because a second hearing officer violated Silva's due process rights (if indeed Kimmelman violated Silva's rights). *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 952–53 (2d Cir.1986) (corrections officer's "filing of unfounded charges did not give rise to a per se constitutional violation actionable under section 1983" when plaintiff was later afforded the opportunity to rebut the charges at a disciplinary hearing before a different corrections officer), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (summary judgment for corrections officer, since "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing"); *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983); *Kingwood v. Coombe,* 96 Civ. 0432, 1997 WL 323913 at *3 (S.D.N.Y. June 13, 1997) (corrections official who "merely reviewed the Inmate Misbehavior Report and recommended that a disciplinary hearing be held ... cannot be held liable for any subsequent due process violations that occurred at the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

disciplinary hearing").

> **FN18.** *See, e.g., Snell v. Suffolk County,* 782 F.2d 1094, 1099 & n. 2 (2d Cir.1986) (noting with approval Judge Weinstein's jury charge that "[i]n determining [§ 1983] liability, you must consider each plaintiff and each defendant separately"); *Crisonino v. New York City Housing Auth.,* 985 F.Supp. 385, 390 (S.D.N.Y.1997) ("Plaintiff's [§ 1983 allegations and defendants' [summary judgment] motion must be assessed separately with respect to each defendant."); *Miller v. Garrett,* 695 F.Supp. 740, 744 (S.D.N.Y.1988) (separately considering plaintiff's § 1983 claims against each defendant).

> **FN19.** The result would be different if the same hearing officer conducted the initial hearing and the rehearing, or if there were any evidence of a conspiracy or other orchestration—*e.g.,* if the first hearing were administratively reversed after the inmate served almost a year, and a second hearing gave the inmate another punishment of slightly less than an additional year, as part of a plan or scheme to avoid a true *Sandin* analysis (assuming that the one year is the demarcation between a *Sandin* violation and no violation). The analogy is to a prohibited scheme to avoid the $10,000 currency reporting requirements by structuring the amount into two or more transactions, each less than $10,000. *See* 31 U.S.C. §§ 5313, 5324; 31 C.F.R. § 103.22(a); *see also, e.g., Ratzlaf v. United States,* 510 U.S. 135, 138–140, 114 S.Ct. 655, 658–59, 126 L.Ed.2d 615 (1994); *United States v. Simon,* 85 F.3d 906, 908 (2d Cir.1996); *United States v. Wapnick,* 60 F.3d 948, 952 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672 & 116 S.Ct. 2556 (1996).

**\*18** Accordingly, defendant Sanford is entitled to summary judgment.

Similarly, defendant Scully is entitled to summary judgment. His only involvement in this case was appointing Sanford as the first hearing officer. Since there

is no *Sandin* liability for the Sanford hearing, Scully also is entitled to summary judgment as to that hearing. In addition, because the delay in starting the Kimmelman hearing was too short to implicate *Sandin* rights, defendants Scully and Selsky are entitled to summary judgment on that claim.[FN20]

> **FN20.** Selsky had involvement in the Kimmelman hearing only to the extent of not reversing the Kimmelman hearing for Kimmelman's failure to provide Silva with the Incident Videotape. Magistrate Judge Roberts already granted summary judgment to Selsky on this ground, finding that "Selsky was not placed on notice of the violation, and cannot be held personally liable for his failure to reverse Kimmelman's disposition on this ground." *Silva v. Sanford,* 1994 WL 455170 at *23. Selsky's failure to reverse the Kimmelman hearing for the delay in commencing the hearing it is a completely separate issue, and because the delay in commencing the hearing was too short to create rights under *Sandin,* defendant Selsky is entitled to summary judgment.

> The Court notes that plaintiffs have not sued defendant Coughlin in his personal capacity and do not seek damages as against him. (*See* Silva 2d Cir.Br. at 30 & n. 11.) Because plaintiff Silva only named defendant Coughlin in his official capacity in accordance with plaintiff's request for injunctive relief, *i.e.,* expungement of Silva's discipline records, and defense counsel has represented that if an expungement is ordered, it can be effectuated by the other defendants (*see* Defs.' 2d Cir. Br. at 48), the Court dismisses the action as to defendant Commissioner Coughlin.

The Court notes that because it has found no liability as to these defendants, the Court need not analyze these defendants' qualified immunity defense arguments. One qualified immunity argument advanced by defense counsel, however, deserves comment, to avoid its repetition in other cases.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

Defendants argue that "[i]n light of *Sandin,* it was not clearly established that, at the time of the events complained of in this matter, plaintiff had a liberty interest in being free from the prison discipline imposed upon him, and thus that he was entitled to procedural due process protections with respect to his disciplinary confinement." (Defs.' Br. at 10.) FN21 The Court disagrees.

> FN21. Defendants cite *Purnell v. Lord,* 952 F.2d 679, 684 (2d Cir .1992), and *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), for the proposition that "the fact that prior law *seemed* settled [that Silva had a liberty interest when he was confined to SHU] is immaterial." (Defs.' Br. at 10.) *Purnell* and *Francis* do not, however, state that prior settled case law is immaterial to determining qualified immunity; rather they state that if earlier case law does not "clearly establish" a liberty interest, subsequent case law "is relevant to our inquiry into the existence of an established liberty interest." *Purnell v. Lord,* 952 F.2d at 684; *Francis v. Coughlin,* 891 F.2d at 48 (when earlier case law is silent or unclear, a subsequent opinion announcing the absence of a constitutional right is relevant to show that that right also did not clearly exist earlier).

Prior to *Sandin* there was no uncertainty in the law. Clear Second Circuit decisional law, based on prior Supreme Court precedent, entitled Silva to due process protection before being subjected to the prison discipline he received. FN22 *Sandin* changed that law. To the extent that under *Sandin,* Silva no longer has a claim, that is one thing (and that is what the Court has held as to the Sanford hearing and the delay before the rehearing). But that does not change the qualified immunity analysis as of the time of those hearings. The subsequent change in the law cannot justify giving a defendant qualified immunity. *See, e.g., Tellier v. Scott,* 94 Civ. 3459, 1998 WL 65983 at *6 n. 15 (S.D.N.Y. Feb.18, 1998) ("Defendants' discussion of the 'confusion' engendered by *Sandin* ... does not support their qualified immunity defense, given that the actions challenged in the action occurred in the period from November 6, 1992 through April 4, 1994. *Sandin* was not decided until June 19, 1995."); *Bruns v. Halford,* 913 F.Supp. 1295, 1305 (N.D.Iowa 1996) ("Because the

*Sandin* decision was handed down after the conduct complained of here occurred, it cannot, of course, establish qualified immunity in this case, because it was not pre-existing law."); *Delaney v. Selsky,* 899 F.Supp. 923, 927–28 (N.D.N.Y.1995) ("It is odd that defendants seek to establish qualified immunity on the basis of *Sandin* when the conduct about which [plaintiff] complains occurred four years before the Supreme Court decided that case.... [Plaintiff] may well have had clearly-established due process rights in 1991 than he would not have, under the same circumstances, in 1995."); *Leslie v. Doyle,* 896 F.Supp. 771, 774 n. 6 (N.D.Ill.1995), *aff'd,* 125 F.3d 1132 (7th Cir.1998) ("At the time [defendant] acted (which is the relevant date for qualified immunity purposes), it had clearly been established that placing an inmate into segregative custody for no reason violated the inmate's constitutional rights.... It has only been afterward, through the *Sandin* decision, that what had previously thought to be clearly established has been ruled otherwise—and that sequence is not the stuff of which a qualified immunity defense may be fashioned.").

> FN22. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 470–76, 103 S.Ct. 864, 870–74, 74 L.Ed.2d 675 (1983); *Gittens v. LeFevre,* 891 F.2d 38, 40–41 (2d Cir.1989) ("New York law has created such a liberty interest [in remaining free from disciplinary confinement] by using mandatory language and requiring specific substantive predicates for keeplock.... Having limited the imposition of keeplock to situations in which an officer reasonably believes a facility rule has been violated, New York State must provide a minimum of due process commensurate with the government function involved and the private interest affected."); *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985) ("It is abundantly clear that disciplinary segregation implicates a sufficiently strong liberty interest as to require notice of the charges and, as the word 'hearing' suggests, some opportunity to present a defense."), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983) (confinement to SHU or keeplock is "sufficient to invoke due process protections").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

---

IV.  *APPLICATION TO THE KIMMELMAN HEARING*

**\*19** Because the Kimmelman hearing imposed disciplinary confinement but not loss of good time credits, *Edwards v. Balisok* does not bar this portion of Silva's § 1983 claim, for the reasons discussed at pages 31–32 above. Accordingly, the Court turns to a *Sandin* analysis of the Kimmelman hearing.

**A. *The First Sandin Prong, Including Duration of Disciplinary Confinement***

Lt. Kimmelman imposed on Silva 18 months in SHU and 18 months loss of certain privileges. *See Silva v. Sanford, 1994 WL 455170 at \*9 (S.D.N.Y. Aug.18, 1994).* On August 15, 1988, Silva's time was converted to keeplock time. *Id.* at \*10. On May 5, 1989, Silva was released from keeplock as a result of good behavior. By the time Silva was released, he had served a total of 403 days in SHU and keeplock. (*See* page 10 above.)

As discussed above (at pages 36–39 & n. 16), the district court decisions in the Second Circuit tend to use 365 days as the presumptive durational dividing line in determining whether a disciplinary sentence imposes an "atypical and significant hardship," such that summary judgment is awarded to defendants where the inmate's disciplinary confinement is less than 365 days (barring unusual circumstances).

On the other hand, where the duration of the inmate's disciplinary confinement is greater than 365 days (or, in some cases, less than a year but still seen as "lengthy" by the Court), the decisions have denied summary judgment, finding that material issues of fact exist. *See, e.g., Tellier v. Scott,* 94 Civ. 3459, 1998 WL 65983 at \*4 (S.D.N.Y. Feb.18, 1998) (denying defendants' summary judgment motion where inmates spent 522 days in SHU compared to prisoner's total sentence of 2–6 years) (citing cases); *Wright v. Miller,* 973 F.Supp. 390, 394 (S.D.N.Y.1997) (plaintiffs' 12 and 15 month SHU terms may have imposed an atypical and significant hardship, so defendants' summary judgment motion denied on *Sandin* grounds; notes that "[o]ther courts have held that longer [than one year] periods of SHU confinement do constitute an 'atypical and significant hardship' giving rise to due process protections."); *Spence v. Senkowski,* No.

91–CV–955, 1997 WL 394667 at \*10 (N.D.N.Y. July 3, 1997) (whether 180 days in SHU is atypical is a question of fact precluding summary judgment); *Kingwood v. Coombe,* 96 Civ. 0432, 1997 WL 323913 at \*4 (S.D.N.Y. June 13, 1997) (deciding the case on due process grounds but noting that "[t]here is a qualitative difference between spending 30 days in segregation ... and spending over 200 days in such confinement.... [T]he latter implicates concerns not raised in *Sandin.* As the length of the period of confinement grows, so too does the likelihood that the interest to be free from such confinement is of 'real substance' ... and subject to due process protections."); *Porter v. Coughlin,* 964 F.Supp. 97, 102 (W.D.N.Y.1997) ("this court ... assumes that a SHU sentence of 36 months constitutes an atypical and significant hardship under *Sandin* "); *Edmonson v. Coughlin,* No. 95–CV–97, 1996 WL 622626 at \*6–7 (W.D.N.Y. Oct. 4, 1996) (denying defendants' summary judgment motion where inmate received 150 day SHU sentence and loss of 3 months good time credit); *Hutchinson v. Blaetz,* 94 Civ. 3695, 1996 WL 374164 at \*4 (S.D.N.Y. July 1, 1996) ("this Court finds that whether Plaintiff's confinement for 286 days imposed an atypical and significant hardship or was 'within the range of confinement to be normally expected' raises questions of material fact"); *Trammell v. Mantello,* No. 90–CV–382, 1996 WL 863518 at \*6–7 (W.D.N.Y. June 10, 1996) (plaintiff has a protected liberty interest in avoiding nearly five years of confinement in SHU and extension of conditional release by 44 months); *Hernandez v. Tiede,* No. 94–CV–908, 1996 WL 863453 at \*5 (W.D.N.Y. May 29, 1996) (denying summary judgment because "the decision of whether 136 days in the SHU is an 'atypical and significant hardship' requires discovery and fact-finding"); *Lee v. Coughlin,* 902 F.Supp. 424, 431 (S.D.N.Y.1995) (confinement of 376 days in SHU on a two year sentence imposes an atypical and significant hardship), *reconsideration granted,* 914 F.Supp. 1004 (S.D.N.Y.1996); *Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443 at \*3 n. 4 (S.D.N.Y. June 28, 1995) ("Whether [plaintiff's] confinement for 87 days in keeplock imposes atypical and significant hardship or is similarly to be expected raises questions of fact."); *see also, e .g., Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (deciding the case on collateral estoppel grounds but noting that Eleventh Circuit decision may call into doubt defendants' argument that 365 days in SHU and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

loss of 12 months good time is not an atypical and significant hardship); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.) (assumes that plaintiff who was sentenced to 1 year solitary confinement "suffered a liberty deprivation and was entitled to due process"), *cert. denied,* 519 U.S. 952, 117 S.Ct. 367, 136 L.Ed.2d 257 (1996); *Whitford v. Boglino,* 63 F.3d 527, 533 (7th Cir.1995) (remanding for fact finding on whether 6 months segregation implicates a liberty interest); *Rowe v. DeBruyn,* 17 F.3d 1047, 1053 (7th Cir.) (one year of disciplinary segregation implicates a liberty interest), *cert. denied,* 513 U.S. 999, 115 S.Ct. 508, 130 L.Ed.2d 416 (1994); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1106 (S.D.N.Y.1995) ("it is unclear how the Supreme Court's *Sandin* decision, involving 30 days confinement in the SHU, should be applied to SHU confinement for two years").

**\*20** Here, Silva spent 403 days in disciplinary confinement. He presented evidence that the conditions in SHU were worse than the conditions in the general population, and expert testimony that lengthy disciplinary confinement could have had a deleterious effect on his mental health. In light of the contradictory statistical evidence presented by the parties as to the "typicality" of disciplinary confinement punishments of greater than a year, summary judgment is not appropriate here. Kimmelman's summary judgment motion with respect to the first *Sandin* prong is therefore denied.

**B. *The Second Sandin Prong***

Defendants also challenge the second *Sandin* prong—"whether the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from [403 days] confinement". Defendants argue that the Second Circuit's pre-*Sandin* case law holding that New York prison regulations afford inmates a liberty interest in remaining free from SHU confinement does not survive *Sandin.* (Defs.' Br. at 23–25.) Defendants, however, have not provided the Court with the relevant regulations in place in 1988 when Silva was confined.[FN23]

> FN23. *See* Silva Br. at 5–6 ("In an attempt to establish that the prison officials did have the complete discretion to impose similarly harsh

conditions of confinement for non-punitive reasons, the defendants rely on a regulation—7 NYCRR 301.7[a]—which provides that an inmate may be confined to an SHU 'for any other reason with the approval of the deputy commissioner for facility operations.' Defendants' Memo pp. 6, 22. Their reliance, however, is misplaced. This regulation was not even in effect at the time of Mr. Silva's hearings, and there was no comparable regulation in effect at that time.") (emphasis removed).

Under the Second Circuit's recent decision in *Scott v. Albury,* Docket No. 96–2943, 1049, 1998 WL 100549 at *7 (2d Cir. March 9, 1998), the Court must look at the regulations in existence when Silva was confined in SHU/keeplock, in order to determine whether at that time New York granted Silva a liberty interest in remaining free from 403 days of disciplinary confinement. The Court therefore presently is unable to determine whether Silva had a due process right in 1988 under the second *Sandin* prong. If the issue is not mooted by a jury verdict for defendant Kimmelman on the first *Sandin* prong, the parties may revisit this issue in post-trial briefs.[FN24]

> FN24. The Court notes that some decisions in this Circuit recently have reaffirmed the validity of pre-*Sandin* Second Circuit case law finding that New York State has granted inmates a protected liberty interest in remaining free from disciplinary confinement. *See, e.g., Wright v. Miller,* 973 F.Supp. at 395 (finding a state-created liberty interest in being free from SHU confinement); *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257–58 (S.D.N.Y.1997) (explaining that "[t]he Supreme Court in *Sandin* expressly stated its belief that the due process principles 'were correctly established and applied in Wolff.' Thus, federal cases finding under Wolff that New York State regulations granted a protected liberty interest to inmates are still good law."); *Justice v. Coughlin,* 941 F.Supp. 1312, 1323–24 (N.D.N.Y.1996) (finding plaintiff had a liberty interest in remaining free from indefinite disciplinary confinement). Other decisions in this Circuit have reached a contrary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

conclusion, at least where administrative confinement is concerned. *See, e.g., Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995) ("*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation."); *Sealey v. Coughlin,* No. 92–CV–47, 1998 WL 113383 at *4 (N.D.N.Y. March 13, 1998) ("It is not clear from the analysis in *Sandin* whether New York law alone continues to confer a liberty interest in remaining free from administrative confinement."); *DeMaio v. Mitchell,* No. 93–CV–1229, 1996 WL 934680 at *3 (N.D.N.Y. July 8, 1996) ("Courts considering the segregation of inmates in New York prisons ... have consistently found that confinement in SHU or keeplock, of itself, creates no protected liberty interest.") (citing cases); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at *3 (S.D.N.Y. April 1, 1996) ("I ... find as a matter of law *Sandin* has overruled previous case law in this Circuit holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation. If, however, the circumstances as alleged indicated that administrative segregation was being used arbitrarily or in retaliation for the exercise of a protected right, the analysis would differ."); *Eastman v. Walker,* 895 F.Supp. 31, 35 (N.D.N.Y.1995) (finding no liberty interest under New York law in remaining free from administrative confinement.)

**C.** *Kimmelman's Liability for Denial of the Videotape, and Damages*

Finally, if Silva has stated a due process claim under *Sandin,* under the law of the case, defendant Kimmelman will be liable (and not qualifiedly immune) for violating plaintiff's due process rights by utilizing the incident videotape as evidence without first telling Silva that he intended to use the tape, as Judge Roberts previously found in *Silva v. Sanford,* 1994 WL 455170 at *22 (S.D.N.Y. Aug.18, 1994). *See, e.g., Agostini v. Felton,* 521U.S. 203, ––––, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) ("Under [the law of the case] doctrine, a court

should not reopen issues decided in earlier stages of the same litigation."); *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) ( " 'As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' ... This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.' "); *Doctor's Assoc., Inc. v. Distajo,* 107 F.3d 126, 131 (2d Cir.), *cert. denied,* 118 S.Ct. 365 (1997); *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d. Cir.1996).

*21 Even if the Court were to reconsider Magistrate Judge Roberts' prior ruling, the result would be the same. In *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719 & 405 U.S. 978, 92 S.Ct. 1190 (1972), the Second Circuit held that an inmate must be informed of the evidence against him. "[A]t a minimum, a prisoner is entitled to be 'confronted with the accusation, informed of the evidence against him ... and afforded a reasonable opportunity to explain his actions.' " *Nieves v. Oswald,* 477 F.2d 1109, 1113 (2d Cir.1973) (quoting *Sostre v. McGinnis,* 422 F.2d at 198); *see also, e.g., Wilkinson v. Skinner,* 34 N.Y.2d 53, 58, 356 N.Y.S.2d 15, 21, 312 N.E.2d 158 (1974) (an inmate's minimum due process rights include "the right to know the charges and evidence against him and to explain his action," citing *Sostre*.). The Second Circuit reaffirmed an inmate's right to be informed about and respond to the evidence against him in *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989), holding that "[i]nmates do enjoy a right to a hearing before a hearing officer who has not prejudged the inmate's guilt, and a limited right to be informed about and to comment on adverse evidence." 892 F.2d at 48. While an inmate's right to adverse evidence is limited by "institutional safety concerns [which] may provide a sufficient reason for prison officials to decline to inform an inmate of adverse evidence," *id.* at 47, here, defendant Kimmelman has provided no such evidence as a reason for denying Silva the tape.

Under the law of the case and under an independent analysis, if Silva states a due process claim under *Sandin,* defendant Kimmelman violated Silva's due process rights by failing to inform Silva that Kimmelman was going to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)

(Cite as: 1998 WL 205326 (S.D.N.Y.))

rely upon the incident videotape.

There is a material issue of fact, however, as to whether Kimmelman's failure to disclose to Silva reliance upon the incident videotape constitutes harmless error, or put differently, whether such violation caused Silva any actual damage, but that goes to the amount of damages Silva would be entitled to if he ultimately satisfies the two pronged *Sandin* test. *See, e.g., Walker v. Bates,* 23 F.3d 652, 658–59 (2d Cir.1994) ("The rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison official responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense."), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995); *Edwards v. Balisok,* 520U.S. 641, ——, 117 S.Ct. 1584, 1587, 137 L.Ed.2d 906 (1997) (plaintiff inmate is entitled "to recover at least nominal damages under § 1983 if he proves" his procedural rights were violated without also proving that the disciplinary hearing result was wrong); *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) ("The awarding of nominal damages for the 'absolute' right to procedural due process 'recognizes the importance to organized society that [this] righ[t] be scrupulously observed' while 'remain [ing] true to the principle that substantial damages should be awarded only to compensate actual injury.' ... Thus, *Carey,* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury.") (quoting and citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978)); *Bernheim v. Litt,* 79 F.3d 318, 326 (2d Cir.1996) (" 'In an action brought pursuant to Section 1983, "even when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right." ' ... Such an award 'is not discretionary where a substantive constitutional right has been violated....' "); *Gibeau v. Nellis,* 18 F.3d 107, 110–11 (2d Cir.1994) If defendant Kimmelman would have found Silva guilty of fighting and possessing a weapon without the incident videotape evidence, or if the jury were to find that Silva was sufficiently aware of the

incident videotape despite Kimmelman's failure to advise Silva of his intent to review and rely upon it, or that in any event Silva suffered no actual damages, then Silva would be entitled to only nominal damages. Defendants have neither moved for summary judgment on this ground nor presented the Court with sufficient evidence to decide the issue on summary judgment. The issue, therefore, remains for trial.

## CONCLUSION

**\*22** For the reasons set forth above, the 43–57 days Silva spent in SHU as a result of the Sanford hearing and the delay in commencing rehearing is not sufficient to create liability under *Sandin.* Accordingly, the Court grants summary judgment to defendants Sanford, Scully, Selsky and Coughlin.

As to defendant Kimmelman, the Court denies summary judgment to either side, because there are material issues of fact under *Sandin* 's first prong as to whether 403 days in disciplinary confinement imposes an atypical and significant hardship. The Court finds, however, that if Silva prevails on both *Sandin* prongs at and after trial, defendant Kimmelman violated Silva's due process rights (and is not entitled to qualified immunity) by not advising Silva that Kimmelman intended to rely upon the videotape, but that there are factual issues for trial as to whether any such violation would entitle Silva to only nominal damages.

## SCHEDULING

Counsel are to appear for a status conference in Courtroom 20D (500 Pearl Street) on May 11, 1998 at 9:00 A.M. to discuss the schedule for the next steps in this action.

SO ORDERED.

S.D.N.Y.,1998.

Silva v. Sanford
Not Reported in F.Supp., 1998 WL 205326 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.